[Crim. No. 20075. June 14, 1979.]

THE PEOPLE, Plaintiff and Appellant, v.
HAROLD EMORY TANNER, Defendant and Respondent.

COUNSEL

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Gloria DeHart, Clifford K. Thompson, Jr., Patrick G. Golden and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Appellant.

John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim and Maurice H. Oppenheim, Deputy District Attorneys, Condit & Hanelt, Thomas W. Condit and Frederic M. Hanelt as Amici Curiae on behalf of Plaintiff and Appellant.

Thomas J. Nolan, Jr., under appointment by the Supreme Court, for Defendant and Respondent.

Wilbur F. Littlefield, Public Defender (Los Angeles), Harold E. Shabo, Dennis A. Fischer, Deputy Public Defenders, Paul N. Halvonik and Quin Denvir, State Public Defenders, Clifton R. Jeffers, Chief Assistant State Public Defender, Michael G. Millman, Harriet Wiss Hirsch, Deputy State Public Defenders, Monroe & Riddet, Keith C. Monroe, Roger S. Hanson and George C. Martinez as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**CLARK, J.**—People appeal from order striking jury finding that defendant used a firearm during the commission of robbery. The order disregards mandatory language of Penal Code section 1203.06.[1] We conclude the trial court erred.

■ ■ ■■■ This appeal involves a single issue: Did the Legislature in enacting section 1203.06 intend its mandatory language be subject to preexisting statutory language providing that a "court may . . . of its own motion . . . and in furtherance of justice, order an action to be dismissed"?[2] (§ 1385.) Section 1385 has been construed to provide judicial power to dismiss or strike—within the court's discretion—allegations which, if proven, would enhance punishment for alleged criminal conduct. (See *People* v. *Burke* (1956) 47 Cal.2d 45, 50-51 [301 P.2d 241].) This case arises because the Legislature in enacting section 1203.06 did not expressly state whether the mandatory provision of section 1203.06 would be subject to judicial discretion pursuant to section 1385.

The facts of this case lend themselves to discretionary action by the trial court—if the court possessed the power of such discretion. Defendant, having no prior criminal record, entered and robbed a retail store clerk of $40, using an unloaded handgun. Leaving, he instructed the clerk to sound an alarm and to notify police. Half an hour later, defendant was arrested in the vicinity of the store. At trial he explained he had committed the crime in an attempt to persuade the store owner to renew recently discontinued security services provided by defendant's employer. However, substantial evidence supports jury findings that defendant possessed requisite criminal intent to commit the crime and to use the firearm.

---

[1] Section 1203.06 provides in pertinent part: "Notwithstanding the provisions of section 1203: (a) Probation *shall not be granted to* . . .: (1) [a]ny person who used a firearm during the commission . . . of any of the following crimes: (iii) Robbery, in violation of Section 211 . . . ." (Italics added.)

After the use-finding was stricken sentencing was suspended and defendant was admitted to probation for a period of five years on condition, among others, that he serve one year in the county jail, beginning 9 July 1976.

Unless otherwise specified, all statutory references herein are to sections of the Penal Code.

[2] The People's notice of appeal purports to challenge striking the use-finding not only as to section 1203.06 but also as to section 12022.5. That section would increase the term of imprisonment for using a firearm in the commission of particular crimes. However, the People have not briefed the issue as to section 12022.5, their argument being confined to section 1203.06 issues. We deem the People to have abandoned section 12022.5 issues.

██ Because probation is a statutory creation (see Cal. Const., art. IV, § 1; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]; *People* v. *Sidener* (1962) 58 Cal.2d 645, 653 [25 Cal.Rptr. 697, 375 P.2d 641]; *In re Haines* (1925) 195 Cal. 605, 622 [234 P. 883]; *People* v. *Hess* (1951) 104 Cal.App.2d 642, 685-686 [234 P.2d 45]), the issue confronting us is one of statutory purpose.[3] ██ While the Legislature has not assisted us in discerning its intent, we must conclude that when proper findings invoking the operation of section 1203.06 have been made, the mandatory provisions of that section may not be avoided by employing section 1385 to strike either the allegations of the complaint or the findings of the jury.

History discloses a continuing legislative interest in limiting the privilege of probation for persons using firearms in committing serious crimes. Between 1923 and 1957 probation was unavailable to defendants using deadly weapons in specified crimes. (Stats. 1923, ch. 144, § 1, p. 291; Stats. 1927, ch. 770, § 1, p. 1493; Stats. 1931, ch. 786, § 1, p. 1633.) Between 1957 and 1975 the Legislature made certain exceptions to the unavailability of probation, allowing trial courts limited discretion. (Stats. 1957, ch. 2054, § 1, pp. 3649-3650; Stats. 1965, ch. 1720, § 1, pp. 3867-3870; see also, *People* v. *Clay* (1971) 18 Cal.App.3d 964 [96 Cal.Rptr. 213].) However, in 1975 the Legislature further limited trial court discretion to cases not falling within section 1203.06. (See Stats. 1975, ch. 1004, §§ 1, 2.) After the 1975 enactment, section 1203 operated to deny probation following particular criminal conduct "[e]xcept in unusual cases where the interests of justice would best be served."

---

[3]We reject any contention that courts are inherently or constitutionally vested with ultimate authority in fixing sentences or imposing penalty enhancing factors for conduct made criminal by legislative enactment. "[S]ubject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch." (*Keeler* v. *Superior Court, supra,* 2 Cal.3d 619, 631.) "[T]he legislative branch of the government has the power to declare that in certain . . . cases, probation may not be granted. The exercise of such power in no way impinges upon the jurisdiction of the judicial branch of the government. It does not impair, restrict nor enlarge upon the jurisdiction of the courts. The function of the courts is to determine the guilt or innocence of an accused. What disposition may thereafter be made by way of penalty is for the Legislature to determine." (*People* v. *Hess, supra,* 104 Cal.App.2d 642, 685-686; see also, *Stephens* v. *Toomey* (1959) 51 Cal.2d 864, 869-870 [338 P.2d 182]; *People* v. *Knowles* (1950) 35 Cal.2d 175, 181 [217 P.2d 1]; *People* v. *Perry* (1964) 230 Cal.App.2d 258, 262-263 [40 Cal.Rptr. 829]; *People* v. *Orrante* (1962) 201 Cal.App.2d 553, 559-566 [20 Cal.Rptr. 480].)

In the instant case the trial court—in rejecting the People's contention that section 1203.06 precluded striking the use-finding—stated that if section 1203.06 were to be so construed it would constitute an unconstitutional invasion of the judicial sentencing function. The court erred in so concluding, leading to its further error in striking the use-finding.

(§ 1203, subd. (d).) The section 1203.06 prohibition against granting probation, however, goes even beyond that of section 1203, denying probation to criminals convicted of enumerated crimes, providing for *no* exception in the interest of justice or otherwise.

■ We must therefore conclude the Legislature intends discretion may be exercised in the case of crimes falling within section 1203 but not within section 1203.06. Any other construction restores the pre-1975 law allowing a court to grant probation to any criminal if the court deems that to do so would be in the interest of justice. Such judicial resurrection renders the 1975 legislation a nullity. (See *People* v. *Superior Court (Smith)* (1969) 70 Cal.2d 123, 132 [74 Cal.Rptr. 294, 449 P.2d 230].)[4]

Our conclusion is supported by pertinent and timely expression of legislative intent existing when section 1203.06 was enacted. The Legislative Counsel's summary of the 1975 enactment states that trial court discretion to grant probation in unusual cases is eliminated so that "probation and suspension of sentence would be denied, *without any exception in unusual cases in the interests of justice,* to any person who uses a firearm during the commission of various felonies, including . . . robbery . . . ." (Leg. Counsel's Dig. of Sen. Bill No. 278, 1 Stats. 1975 (Reg. Sess.) Summary Dig., ch. 1004, p. 262; italics added.) This statement is consistent with a staff memorandum prepared by the Senate Committee on the Judiciary stating that Senate Bill No. 278 (in which the 1975 amendments to §§ 1203 and 1203.06 were introduced), "Prohibits, *without exception,* the granting of probation to persons who have carried or used firearms in connection with certain crimes, for which probation may be obtained under existing law in unusual cases in the interests of justice." (Italics added.) Finally, there exists the executive statement of Governor Brown issued by press release in which he explained the effects of the legislation. He stated: "By signing this bill, I want to send a clear message to every person in this state that using a gun in the commission of a serious crime means a stiff prison sentence. Whatever the circumstances, however eloquent the lawyer, *judges will no longer have discretion to grant probation even to first offenders.*" (Governor's Press Release No. 284 (Sept. 23, 1975), italics added.)

---

[4]Illustrative of legislative intent, even as understood by opponents of the enactment, is the following excerpt from an 18 September 1975 letter from the American Civil Liberties Union addressed to the Governor: "The Legislature in enacting such legislation is presuming omniscience predicting that in no case will probation, even conditioned on jail time, ever be an acceptable alternative."

Finally, whereas section 1385 is general in nature, relating to the broad scope of dismissal, section 1203.06 is specific, relating to the limited power of dismissal for purposes of probation—the very matter at issue. Section 1203.06 is the later enactment, adopted by the Legislature in response to the particular problem at hand. ■ A specific provision relating to a particular subject will govern a general provision, even though the general provision standing alone would be broad enough to include the subject to which the specific provision relates. (*Rose* v. *State of California* (1942) 19 Cal.2d 713, 723-724 [123 P.2d 505].)

■ Because we conclude section 1385 is inapplicable when proper findings have been made invoking section 1203.06, it follows that the trial court erred in striking the use finding and sending defendant to county jail rather than to prison. (Cf. Stats. 1977, ch. 165, § 22.)

■ However, given the unusual postconviction manner in which the issue of judicial discretion has been presented and finally resolved, it follows Mr. Tanner should not necessarily be committed to prison. The uncertainty arising from the rule of law resulting in the trial court's erroneous disposition, has created both an unusual burden on defendant and a dilemma for this court. Simply put, is it not unfair to require Mr. Tanner to now serve a second term for his criminal act?

While pertinent Penal Code provisions fairly warned Mr. Tanner of the penalty mandated for using a gun in the commission of robbery, we are concerned with the judicial ambivalence preceding final disposition of his case. In a highly similar case the United States Court of Appeals held that defendants, while receiving unauthorized probation for their crimes, should nevertheless not be resentenced to required life imprisonment or death because resentencing would "work a substantial hardship on the Defendants." (*United States* v. *Denson* (5th Cir. 1979) 588 F.2d 1112, 1132.) The court stated, among other things: "These Defendants have been told after such prosecutions and investigations that they would be subjected to one year's incarceration to be followed by five years supervision. They prepared to surrender for such incarceration. They have adjusted their lives to the punishment assessed. They have sought and secured employment opportunities consistent with the term of incarceration imposed. To withdraw the probation granted for which the Defendants and their families have prepared themselves would work a substantial hardship on the Defendants and their families." (*Id.,* at p. 1132.) The substantial hardship was deemed to exist even though

defendants in *Denson* had not yet served the one-year incarceration imposed for a concurrent crime.

Mr. Tanner having complied with his conditions of probation—including one year's stay in county jail—we determine a second incarceration would be unjust.

The judgment is affirmed.

Mosk, J., Richardson, J., and Manuel, J., concurred.

**BIRD, C. J., TOBRINER, J.,** and **NEWMAN, J.,** Concurring and Dissenting.—We concur in the result reached in the majority opinion, which permits appellant Harold Tanner to be placed on probation despite the jury's finding that he had "used a firearm during the commission . . . of . . . [a] [r]obbery" within the meaning of Penal Code section 1203.06. We do not concur in the language of the majority opinion insofar as it suggests that the trial court had no power to strike the "use" finding in order to place appellant on probation. For reasons that each of us expresses more fully in separate opinions, we remain convinced that the trial court does have that power.

**TOBRINER, J.,** Concurring and Dissenting.—I concur in the judgment of the court, which—it should be emphasized—*affirms* the trial court judgment placing defendant on probation. I do not agree, however, with the discussion in the lead opinion—technically dicta—which suggests that Penal Code section 1203.06 can properly be interpreted as abrogating a trial court's power to strike a use of a firearm finding under Penal Code section 1385. As I shall explain, the lead opinion's statutory interpretation directly conflicts with all of the prior California decisions which have construed similar sentencing statutes in relation to section 1385.

Moreover, the *result* reached by the lead opinion is plainly inconsistent with the opinion's purported statutory interpretation. Although the lead opinion suggests that the language of section 1203.06 is so clear and absolute as to preclude trial courts from exercising the discretion explicitly afforded them by section 1385, its holding, by contrast, reveals that the statutory language has not been construed to preclude this court from exercising a nonstatutory, presumably inherent, discretion so as to relieve a defendant who has used a gun of a mandatory prison sentence.

If section 1203.06's language does not prevent this court from exercising discretion in order to avoid "injustice" or "unfairness" in the case of Mr. Tanner, then clearly that same statutory language may not reasonably be construed as abrogating a trial court's statutorily authorized discretion under section 1385. The lead opinion thus represents a classic example of a court's action speaking louder than its words.

The numerous flaws in the lead opinion are apparent from the outset. After explicitly acknowledging that "[t]his case arises because *the Legislature in enacting section 1203.06 did not expressly state whether the mandatory provision of section 1203.06 would be subject to judicial discretion pursuant to section 1385*" (italics added) (*ante,* p. 518), the opinion replicates the legislative omission by completely failing either to apply, to distinguish, to overrule—or, indeed, even to mention—the numerous California decisions that have specifically dealt with this precise issue in prior cases. As I discuss below, for the past 20 years—beginning with *People* v. *Burke* (1956) 47 Cal.2d 45 [301 P.2d 241]—California courts have repeatedly held that in light of the historically important role played by section 1385 in the sentencing process, an ostensibly "mandatory" sentencing statute will not be interpreted as abrogating the authority accorded by section 1385 in the absence of explicit statutory language curtailing such authority. In simply ignoring this line of controlling precedent, the lead opinion can only create uncertainty and confusion; lower courts, faced in the future with the responsibility of construing similar sentencing statutes, are provided no guidance whether to apply previously enunciated principles or the novel interpretation developed by the instant lead opinion.

Moreover, by closing its eyes to the prior authorities, the lead opinion ignores a fundamental canon of legislative interpretation which teaches that in construing a statute courts should properly presume that the Legislature was aware of existing judicial decisions interpreting similar provisions and drafted the statute in light of such decisions. When the Legislature enacted section 1203.06 in 1975, the controlling decisions made it clear that a sentencing statute would not be construed to abrogate a court's section 1385 power unless the statute specifically so declared; since the draftsmen of section 1203.06 did not include any language specifically repealing or abrogating section 1385, under traditional principles the statute should not be interpreted as eliminating that power.

Indeed, as discussed more fully below, the legislative omission in this case is brought into sharp focus when the terms of section 1203.06 are

compared with the provisions of Penal Code section 1203.08, a similar "no probation" statute, coauthored by one of the draftsmen of section 1203.06, and enacted just one year after section 1203.06. In section 1203.08, unlike section 1203.06, the Legislature specifically included a separate provision which, in cases falling within the ambit of section 1203.08, expressly limits a trial court's power to strike under section 1385. That legislative action, coming close on the heels of the enactment of section 1203.06, indicates a legislative awareness of the governing California authorities and demonstrates that the Legislature is quite capable of expressing itself clearly when it intends to eliminate a trial court's power to strike. In the face of the differing provisions of section 1203.08, this court cannot properly conclude that section 1203.06 evidences a clear abrogation of a trial court's section 1385 power.

Furthermore, contrary to the lead opinion's suggestion, by interpreting section 1203.06 in accordance with past authorities we would not be rendering the 1975 legislation a "nullity." Prior to 1975, section 1203—the general probation statute—included a provision specifically giving courts power to grant probation in an "unusual" gun use case; trial courts apparently accorded the "unusual case" provision of section 1203 a more expansive interpretation than the Legislature thought appropriate and in 1975 the Legislature eliminated the "unusual case" provision of section 1203 for such cases. That legislative action unquestionably evinced an intent to reduce the granting of probation in gun-use cases, a legislative policy decision that certainly has not been lost on trial courts and that has been and will continue to be reflected in a sharp decrease in the granting of probation in such cases. The legislative disapproval of the trial courts' pre-1975 probation practice, however, is by no means irreconcilable with a legislative decision to leave the trial courts' section 1385 power intact; the Legislature may well have desired to disapprove the trial courts' quite liberal pre-1975 probation practice without completely stripping such courts of their traditional power to strike allegations or findings in the truly extraordinary or exceptional case.

Indeed, the lead opinion's ultimate determination to relieve Tanner of a prison sentence is eloquent testimony to the strength of the traditional, underlying judicial policies in this area, recognizing that exceptional circumstances—unforeseen by the Legislature—may in rare cases warrant a departure from a generally appropriate sentence. As already noted, this holding demonstrates that the lead opinion has not, in fact, interpreted section 1203.06 as removing *all* judicial discretion; the disposition of this case with respect to the present defendant is clearly an exercise of just

such discretion. While I, of course, agree with the affirmance of the judgment, I fear that the inconsistency of the lead opinion's reasoning and result can only bring additional confusion to the lower courts; thus, for example, the opinion fails to illuminate whether its holding applies only to the present defendant, to all cases pending on appeal, or to all future cases in which a defendant is erroneously granted probation. The Legislature's schizophrenia in drafting probation statutes (compare §§ 1203.06, 1203.07 with §§ 1203.08, 1203.09) is now reflected in the lead opinion's parallel inconsistency in upholding probation for Tanner and casting into complete confusion the issue whether courts under facts like *Tanner* can grant probation at all.

Having reviewed the major deficiencies in the lead opinion, I explain the basis of my conclusion that the trial court judgment should be affirmed.

> *Because section 1203.06 does not in explicit terms restrict a trial court's power to strike under section 1385, the provision cannot be interpreted to preclude a trial court's exercise of such power in light of People v. Burke (1956) 47 Cal.2d 45 and its progeny.*

From at least as early as 1850, trial courts in California have enjoyed broad authority to dismiss criminal actions in furtherance of the interests of justice. (Stats. 1850, ch. 119, p. 323; Stats. 1851, ch. 29, p. 279; see, e.g., *People* v. *Tenorio* (1970) 3 Cal.3d 89, 94 [89 Cal.Rptr. 249, 473 P.2d 993]; *People* v. *Sidener* (1962) 58 Cal.2d 645, 648-649, 658-663 [25 Cal.Rptr. 697, 375 P.2d 641].) For more than a century this judicial authority has been codified in section 1385 which provides in relevant part that "[t]he court may, either of its own motion or upon application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed."

Although section 1385's language refers explicitly to the dismissal of an entire criminal action, our court has long recognized that the section also authorizes a trial court to dismiss or "to strike" only a portion of the accusatory pleading, permitting the court, for example, to dismiss one or more counts of a multicount complaint or to strike allegations of prior convictions which may increase a defendant's punishment or restrict the nature of his sentence. (See, e.g., *People* v. *Ruiz* (1975) 14 Cal.3d 163, 166 [120 Cal.Rptr. 872, 534 P.2d 712]; *People* v. *Navarro* (1972) 7 Cal.3d 248, 257 [102 Cal.Rptr. 137, 497 P.2d 481]; *In re Cortez* (1971) 6 Cal.3d 78,

83-85 [98 Cal.Rptr. 307, 490 P.2d 819]; *People* v. *Tenorio, supra,* 3 Cal.3d 89, 94; *People* v. *Burke, supra,* 47 Cal.2d 45, 50-51.)

The relevant decisions additionally establish that a trial court may exercise its section 1385 power at the time of sentencing, as the trial court did here, and that a court may utilize this power to strike a count or an allegation even if the jury or court has found the defendant guilty of such count or has found the allegation to be true. As our court explained in *People* v. *Burke, supra,* 47 Cal.2d 45, 50-51: "The procedure of 'striking' or setting aside or dismissing, a charge of a prior conviction (or any of multiple counts or allegations of an indictment or information) at the time of sentence . . . is commonly used in trial courts, not only where the prior conviction has not been legally established, but also where the fact of the conviction has been shown but the trial court has concluded that 'in the interest of justice' defendant should not be required to undergo a statutorily increased penalty which would follow from judicial determination of that fact. [Citations.]"

In the instant case, the trial court did not utilize its section 1385 power to strike an allegation of a *prior conviction* as in *Burke* or in many of our other cases, but instead utilized its authority to strike a *use of a firearm* allegation and finding. As the above quotation from *Burke* demonstrates, however, in that case we explicitly recognized that the authority to strike conferred by section 1385 extends beyond allegations of prior convictions to other "allegations of an indictment or information" (47 Cal.2d at p. 50) which might subject a defendant to increased punishment. In *People* v. *Dorsey* (1972) 28 Cal.App.3d 15 [104 Cal.Rptr. 326], the Court of Appeal specifically held that a trial court has authority under section 1385 to strike a use finding at the time of sentencing, at least for the purpose of avoiding the increased five-year punishment that would be otherwise mandated by section 12022.5.[1] Since the People in this case do not challenge the trial court's striking of the use allegation with regard to the application of section 12022.5, they apparently acknowledge that, at least in general, the power to strike conferred by section 1385 includes the power to strike a use allegation.[2]

---

[1]At the time of *Dorsey,* section 12022.5 provided in relevant part: "Any person who uses a firearm in the commission or attempted commission of a robbery, assault with a deadly weapon, murder, rape, burglary, or kidnapping, upon conviction of such crime, shall, in addition to the punishment prescribed for the crime of which he has been convicted, be punished by imprisonment in the state prison for a period of not less than five years. Such additional period of imprisonment shall commence upon expiration or other termination of the sentence imposed for the crime of which he is convicted and shall not run concurrently with such sentence."

[2]Subsequent to the trial court's ruling in this case, the Legislature amended section 12022.5 to effectively codify the *Dorsey* rule. (See Stats. 1976, ch. 1139, § 305, p. 5162.)

The People argue, however, that even if the trial court may exercise its power to strike a use finding for purposes of avoiding an increased sentence under section 12022.5, the court may not utilize this section 1385 power to render an otherwise ineligible defendant eligible for probation.[3] In the past, courts have utilized the section 1385 power to strike to achieve a number of purposes in the sentencing context: in some cases the power to strike has been utilized to render a defendant eligible for imprisonment in county jail rather than in state prison or to enable an otherwise ineligible defendant to participate in a narcotics rehabilitation program (see, e.g., *People* v. *Burke, supra*; *People* v. *Navarro, supra,* 7 Cal.3d 248, 258); in other cases section 1385 has been invoked to afford the defendant the benefit of a shorter minimum or maximum sentence (see, e.g., *People* v. *Tenorio, supra,* 3 Cal.3d 89, 95, fn. 1; *People* v. *Dorsey, supra*; see generally Burke, *Striking Priors* (1958) 33 State Bar J. 556); in still other cases, however, contrary to the implication of the People's argument, the section 1385 power to strike has been explicitly exercised to render an otherwise ineligible defendant eligible for probation. (See, e.g., *People* v. *Ruiz, supra,* 14 Cal.3d 163, 166; *In re Cortez, supra,* 6 Cal.3d 78, 85; *In re Gomez* (1973) 31 Cal.App.3d 728 [107 Cal.Rptr. 609].)

Indeed, in *In re Cortez, supra,* our court emphatically declared that *"one of the paramount purposes of a motion to strike priors is to make the defendant eligible for probation.* The thrust of the motion is to persuade the sentencing judge that, despite the existence of the prior, the petitioning [defendant] is a fit subject for probation." (Italics added.) (6 Cal.3d at p. 85.) Hence, the fact that the trial court undertook its action in

Section 1170.1, subdivision (g), enacted in 1977 as part of the so-called "Boatwright Amendments" to the Uniform Determinate Sentencing Act of 1976, now provides: "Notwithstanding any other provision of·law, the· court may strike the additional punishment for the enhancements provided in . . . [section] 12022.5 . . . if it determines that there are circumstances in mitigation of the additional punishment and states on the record its reasons for striking the additional punishment."

While the recently enacted provisions of the Determinate Sentencing Act confirm the *Dorsey* result, the new legislation does not purport to affect the granting or denial of probation. Section 1170, subdivision (a)(2) (Stats. 1977, ch. 165, § 15, p. 647) provides in this regard that "[n]othing in this article shall affect any provision of law . . . which authorizes or restricts the granting of probation or suspending the execution or imposition of sentence . . . ."

[3]In this regard, the People assert that the striking of a use finding for purposes of section 12022.5 does not *necessarily* eliminate the use finding for purposes of section 1203.06. In this case, however, we have no occasion to decide whether the striking of a use finding (or a prior) to achieve one sentencing objective *necessarily* eliminates the finding for all sentencing purposes or whether a trial court retains discretion to limit the effect of such striking, for here the trial court made it clear that it·was exercising its discretion to strike the use finding for purposes of both section 12022.5 and section 1203.06.

this case to render the defendant eligible for probation does not in any way indicate that the court did not appropriately exercise its power under section 1385.

The People additionally assert, however, that even if section 1385 authorizes a trial court to strike a use finding and even if, *in general,* section 1385 may be utilized to render an otherwise ineligible defendant eligible for probation, the trial court could not properly exercise such power for such a purpose in the instant case because of the specific provisions of section 1203.06. Section 1203.06, enacted in 1975, provides in part that *"Notwithstanding the provisions of section 1203* [the general probation section] . . . [p]*robation shall not be granted to,* nor shall the execution or imposition of sentence be suspended for . . . *any person who used a firearm during the commission* or attempted commission *of* any of the following crimes. . . . (iii) *Robbery,* in violation of Section 211." (Italics added.) Section 1203.06 goes on to define "used a firearm" to mean "to display a firearm in a menacing manner, to intentionally fire it, or to intentionally strike or hit a human being with it" (§ 1203.06, subd. (b)(3)), and also provides that in order to bar probation under the section the defendant's use of the firearm must be alleged in the information or indictment and either be admitted by the defendant or be found true by the jury or the court. (§ 1203.06, subd. (b)(1).)[4]

---

[4]Section 1203.06 provides in full: "Notwithstanding the provisions of Section 1203:

"(a) Probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any of the following persons:

"(1) Any person who used a firearm during the commission or attempted commission of any of the following crimes:

"(i) Murder.

"(ii) Assault with intent to commit murder in violation of Section 217.

"(iii) Robbery, in violation of Section 211.

"(iv) Kidnapping, in violation of Section 207.

"(v) Kidnapping for ransom, extortion, or robbery, in violation of Section 209.

"(vi) Burglary of the first degree, as defined in Section 460.

"(vii) Rape by force or violence, in violation of subdivision (2) of Section 261.

"(viii) Rape by threat of great and immediate bodily harm in violation of subdivision (3) of Section 261.

"(ix) Assault with intent to commit rape, the infamous crime against nature, or robbery, in violation of Section 220.

"(x) Escape, in violation of Section 4530, or Section 4532.

"(2) Any person previously convicted of a felony specified in subparagraphs (i) through (x) of paragraph (1), who is convicted of a subsequent felony and who was armed with a firearm at any time during its commission or attempted commission or was unlawfully armed with a firearm at the time of his arrest for the subsequent felony.

"(b)(1) The existence of any fact which would make a person ineligible for probation under subdivision (a) shall be alleged in the information or indictment, and either admitted by the defendant in open court, or found to be true by the jury trying the issue

The People argue that since the mandatory language of section 1203.06, emphasized above, denies probation without exception to any robber who has been found to have used a firearm in the commission of his offense, it must follow that the trial court in the instant case retained no power under section 1385 to strike the use finding so as to render the present defendant eligible for probation.

As noted at the outset of this opinion, our court faced a very similar contention in *People* v. *Burke, supra,* 47 Cal.2d 45. In *Burke,* the defendant was convicted of possession of marijuana, then a felony. The information had alleged that defendant had previously been convicted of a similar marijuana offense, and at arraignment defendant admitted the existence of the prior conviction. At that time, section 11712 of the Health and Safety Code provided that "[a]ny person convicted under this division for having in possession any narcotic [defined to include marijuana] . . . shall be punished by imprisonment in the county jail for not more than one year, or in the state prison for not more than 10 years. [¶] If such person has been previously convicted of any offenses described in the division . . . the previous conviction shall be charged in the indictment or information and if found to be true by the jury, upon a jury trial, or if found to be true by the court, upon a court trial, or [if] admitted by the defendant, *he shall be imprisoned in the state prison* for not less than two years nor more than 20 years." (Italics added.)

Notwithstanding section 11712, which ostensibly mandated a state prison sentence since defendant had admitted a prior marijuana conviction, the trial court at the time of sentencing struck the charge as to the prior conviction and sentenced the defendant to county jail. On appeal the People argued, as they do in the present case, that in light of the mandatory nature of section 11712's prescriptions, the trial court had no authority under section 1385 to strike the admitted prior for purposes of avoiding a state prison sentence.

of guilt or by the court where guilt is established by plea of guilty or nolo contendere or by trial by the court sitting without a jury.

"(2) This subdivision does not prohibit the adjournment of criminal proceedings pursuant to Division 3 (commencing with Section 3000) or Division 6 (commencing with Section 6000) of the Welfare and Institutions Code.

"(3) As used in subdivision (a) 'used a firearm' means to display a firearm in a menacing manner, to intentionally fire it, or to intentionally strike or hit a human being with it.

"(4) As used in subdivision (a) 'armed with a firearm' means to knowingly carry a firearm as a means of offense or defense."

In *Burke,* our court rejected the People's contention, observing that the statutory language on which the People relied "[does] not purport to divest the trial court (or to hold that the court constitutionally could be divested) of the power to control the proceedings before it insofar as the essentials of the judicial process are concerned; i.e., to find the defendant guilty or not guilty of any offense charged, or of a lesser included offense, or to dismiss the action *in toto* or to strike or dismiss as to any or all of multiple counts or charges of prior convictions." (47 Cal.2d at p. 52.) In the absence of an explicit statutory directive that the Legislature had intended to eliminate or restrict the trial court's general power to strike under section 1385, the *Burke* court concluded that the statute should not be so construed. Accordingly, *Burke* upheld the trial court's action in striking the prior conviction.

Subsequent decisions of this court have reaffirmed the *Burke* holding that, in the absence of an explicit legislative restriction of the trial court's power under section 1385, a restriction on that power will not generally be implied. (See, e.g., *People* v. *Superior Court (Howard)* (1969) 69 Cal.2d 491, 502 [72 Cal.Rptr. 330, 446 P.2d 138] ("the discretion of the judge [under section 1385] is absolute except where the Legislature has specifically curtailed it").) In *People* v. *Dorsey, supra,* 28 Cal.App.3d 15, the Court of Appeal reiterated this established principle in finding that the mandatory sentencing provisions of section 12022.5 (see fn. 4, *ante*) did not preclude a court's exercise of its section 1385 power to strike a use finding.

As the *Dorsey* court explained, in California "[t]he imposition of sentence and the exercise of sentencing discretion" (28 Cal.App.3d at p. 18) have traditionally been viewed as "fundamentally judicial in nature" (see, e.g., *People* v. *Tenorio, supra,* 3 Cal.3d 89, 94; *People* v. *Superior Court (On Tai Ho)* (1974) 11 Cal.3d 59, 66 [113 Cal.Rptr. 21, 520 P.2d 405]), and section 1385 has long been recognized as an essential tool to enable a trial court "to properly individualize the treatment of the offender." (28 Cal.App.3d at p. 18; see generally Burke, *Striking Priors* (1958) 33 State Bar J. 556.)[5] Emphasizing the significance of the section 1385 power with respect to the court's fulfillment of its traditional judicial

---

[5]Recently, in *Lockett* v. *Ohio* (1978) 438 U.S. 586, 602 [57 L.Ed.2d 973, 988, 98 S.Ct. 2954, 2963-2964], Chief Justice Burger took note of a trial court's traditional authority to individualize sentences: "[T]he concept of individualized sentencing in criminal cases generally, although not constitutionally required, has long been accepted in this country. See *Williams* v. *New York* [(1949)] 337 U.S. [241], 247-248 . . . ; *Pennsylvania ex rel. Sullivan* v. *Ashe* [(1937)] 302 U.S. [51] . . . . Consistent with that concept, sentencing judges have traditionally taken a wide variety of factors into account. . . ."

responsibility in the sentencing context, the *Dorsey* court put the Legislature on notice that the judiciary would not infer a legislative intent to restrict a court's power to dismiss or to strike under section 1385 in the absence of an *explicit* legislative restriction of the section 1385 power. The *Dorsey* court stated in this regard: "If the Legislature intends that the provisions of Penal Code section 12022.5 not be subject to dismissal, *it could and should so indicate.*" (Italics added.)

The People concede that section 1203.06, enacted several years after the *Burke, Howard* and *Dorsey* decisions, contains no provision which purports expressly to eliminate or restrict a trial court's power to strike under section 1385. The People argue, however, that despite the absence of an explicit statutory restriction on the power to strike, the legislative history of section 1203.06 demonstrates that the Legislature generally intended to curtail trial courts' discretion in this area, and that, as a consequence, a limitation on a trial court's power to strike is necessarily *implied* in the legislative action. In this regard, the People point to a number of statements by both legislative and executive spokesmen to demonstrate that a principal purpose behind the enactment of section 1203.06 was the elimination of the limited discretion trial courts had previously enjoyed under section 1203 to grant probation in a case in which a gun was used in the commission of a serious offense.[6]

The legislative history upon which the People rely unquestionably indicates—as indeed, does the introductory language of section 1203.06 itself—that one of the main purposes of the enactment of section 1203.06 was to curtail, in the specific instances enumerated in section 1203.06, the discretion to grant probation which had previously been accorded trial

[6]Prior to enactment of the 1975 legislation, section 1203 generally prohibited the granting of probation to a defendant who committed a serious offense while armed with a deadly weapon, but provided an exception for "unusual cases where the interests of justice demand" the granting of probation. (Former § 1203, enacted Stats. 1971, ch. 706, § 1, p. 1368.)

The 1975 legislation eliminated section 1203's "unusual case" exception in instances in which a defendant uses a firearm in the commission of a serious offense, but contrary to the arguments of the People and of the Governor's press release quoted in the lead opinion, the legislation did not guarantee that every person who uses a firearm in the commission of a serious felony would automatically be denied probation. As noted above, the denial of probation under section 1203.06 follows only if the use of the firearm is specifically alleged in the complaint; the section does not purport to preclude a prosecutor, in his discretion, from declining to plead such an allegation in "an unusual case" nor does it purport to forbid plea bargaining in appropriate cases to avoid ineligibility for probation. (Cf. *People* v. *Flores* (1971) 6 Cal.3d 305, 308-309 [98 Cal.Rptr. 822, 491 P.2d 406].) Consequently, the legislation does not have nearly as "automatic" an effect in denying probation as the People suggest.

courts *under section 1203.* None of the legislative materials to which the People refer, however, makes any mention of the specific question presented by this case, namely whether the provisions of section 1203.06 additionally purported to repeal a trial court's traditional section 1385 power to strike priors[7] or use allegations.[8] In this regard, it should be emphasized that unlike other recently enacted sentencing statutes limiting probation in designated circumstances, section 1203.06 declares only that its provisions are applicable "[n]otwithstanding *the provisions of section 1203*"; the section contains no language explicitly displacing all other relevant statutes.[9]

It is well settled in this state, of course, that "[r]epeals by implication are not favored . . . ." (See, e.g., *Rextrew* v. *City of Huntington Park* (1942) 20 Cal.2d 630, 634 [128 P.2d 23].) Furthermore, as we have seen, at the time of the enactment of section 1203.06 in 1975, the *Burke, Howard*

---

[7]In addition to denying probation to anyone convicted of an enumerated offense who is found to have used a firearm, section 1203.06 also purports to deny probation to anyone who has suffered a *prior conviction* of one of the enumerated offenses and who is found to have *been armed* during the commission of a subsequent felony. (§ 1203.06, subd. (a)(2), quoted in fn. 4, *ante.*) Although the Legislature must have been aware, under prior decisions of this court (e.g., *In re Cortez, supra*), that a trial court possessed the power under section 1385 to avoid the denial of probation under subdivision (a)(2) by striking an allegation of such a prior conviction, the Legislature failed to include any statutory language to preclude such striking. This omission provides additional support for our conclusion that the trial court's power to strike is not affected by section 1203.06.

[8]Significantly, although the Attorney General's office communicated with the legislative committees considering the 1975 legislation on several occasions, advocating the passage of the legislation to supplement, inter alia, the sentencing provisions of section 12022.5 (which, of course, had already been held to be subject to the trial court's power to strike (*People* v. *Dorsey, supra*)), at no time did the Attorney General or his staff indicate that the provisions of the proposed legislation would eliminate a trial court's power to strike under section 1385. Since the Attorney General's office had directly participated in all of the earlier litigation involving the section 1385 issue, the Attorney General surely would have suggested a modification of the legislation to specifically restrict a trial court's section 1385 power to strike had such a restriction been intended.

Indeed, at oral argument the Attorney General conceded that nothing in section 1203.06 prevents a trial court—upon motion of a district attorney—from striking a use finding *under section 1385* if the district attorney determines, in the exercise of his discretionary judgment, that the evidence is insufficient to support the use allegation. (Under *People* v. *Tenorio, supra,* 3 Cal.3d 89, of course, a trial court could similarly strike a use allegation or finding for insufficient evidence on its own motion, without the concurrence of the district attorney.) Having conceded that the trial court retains such a power to strike a use finding under section 1385 notwithstanding section 1203.06, the Attorney General fails to explain why a trial court cannot exercise *all* of its traditional section 1385 power in such a case. Section 1203.06, of course, contains no provision which purports to permit a trial court to exercise only a portion of its authority under section 1385.

[9]By contrast, the introductory clauses of sections 1203.08 and 1203.09 provide that those sections are applicable "[n]otwithstanding *any other provision of law.*" (Italics added.)

and *Dorsey* decisions had made it quite clear that no matter how "mandatory" the terms of a sentencing provision appear, such a provision would not be interpreted to curtail a trial court's power under section 1385 to strike in the absence of explicit statutory language that specifically and unambiguously restricted such power. A cardinal principle of statutory interpretation proclaims, of course, that "in adopting legislation the Legislature is presumed to have had knowledge of existing domestic judicial decisions and to have enacted and amended statutes in the light of such decisions as have a direct bearing on them." (Fn. omitted.) (*Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 200 [288 P.2d 12, 289 P.2d 242]; see, e.g., *In re Phyle* (1947) 30 Cal.2d 838, 845 [186 P.2d 134].) Accordingly, inasmuch as section 1203.06 contains no provision purporting to restrict a trial court's section 1385 power to strike, we must assume that the Legislature recognized that the statute would not be interpreted as eliminating such power. (See Yegan, *Penal Code Section 12022.5 Circa 1977* (1977) 52 L.A. Bar. J. 462, 469; cf. Uelman, *California's New Marijuana Law* (1976) 51 State Bar J. 27, 82.)

Other sentencing provisions, enacted in the same legislative session as section 1203.06, make it quite clear that the Legislature has no difficulty explicitly restricting a trial court's power to strike when it intends to do so. (See Veh. Code, § 23102, subd. (g) enacted Stats. 1975, ch. 385, § 1, p. 859.)[10] Indeed, in 1976, just a year after the enactment of section 1203.06, the Legislature—in apparent recognition of the *Burke-Dorsey* line of decisions—expressly included a separate subdivision which does limit a trial court's power to strike or dismiss when it enacted section 1203.08 of the Penal Code,[11] an analogous "no probation" statute which, in other respects, is generally patterned after section 1203.06.[12]

---

[10]Section 23102 subdivision (g) provides: "Except in unusual cases where the interests of justice demand an exception, *the court shall not strike a prior [drunk driving] conviction . . . for purposes of sentencing in order to avoid imposing as part of the sentence or term of probation the minimum time in confinement in the county jail [48 hours] and the minimum fine [$250] as provided in subdivision (f).*" (Italics added.)

[11]There are currently two provisions of the Penal Code which the Legislature has designated Penal Code section 1203.08. The provision referred to in the present context was enacted as section 1203.11 by Statutes of 1976, chapter 1135, section 1, page 5052, and was renumbered and amended by Statutes of 1977, chapter 735, section 1, page 2325. All references to "section 1203.08" are to that provision.

The additional section 1203.08 was enacted by Statutes of 1977, chapter 1153, section 1, page 3700. References to that statute will be designated "section 1203.08 (1977)."

[12]Section 1203.08 (see fn. 11, *ante*) reads in full:

"(a) Notwithstanding any other provision of law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any adult person convicted of a designated felony who has been previously convicted as an adult under charges separately brought and tried two or more times of any designated felony or in any

The legislative history of section 1203.08, moreover, demonstrates quite clearly that the inclusion of this separate subdivision, subdivision (b)(2), was by no means inadvertent. As originally introduced on April 7, 1976, the bill which ultimately was enacted as section 1203.08 did not contain this subdivision. (Sen. Bill No. 2137 (1975-1976 Reg. Sess.).) On June 1, 1976, however, the bill was amended in the Senate to add subdivision (b)(2). On the same date, Senator Robbins, *a coauthor of section 1203.06,* was added as a coauthor of section 1203.08. Thus, the legislative draftsmen of section 1203.08, obviously aware of the language of section 1203.06, evidently recognized the necessity of including additional language in section 1203.08 to restrict a trial court's power to strike or dismiss allegations under Penal Code section 1385.

Inasmuch as section 1203.06, unlike section 1203.08, contained no language expressly restricting a trial court's power to strike, at least some legislators may have been willing to accede to the seemingly inflexible provisions of section 1203.06 precisely because of their awareness that the section did not remove all "safety valves" to further the ends of justice in a particular case, either through a trial court's exercise of the section 1385 power or by virtue of a prosecutor's exercise of his traditional discretion. (See fn. 6, *ante.*)[13] In accepting the Attorney General's proposed

---

other place of a public offense which, if committed in this state, would have been punishable as a designated felony, if all the convictions occurred within a 10-year period. Such 10-year period shall be calculated exclusive of any period of time during which the person has been confined in a state or federal prison.

"(b) (1) The existence of any fact which would make a person ineligible for probation under subdivision (a) shall be alleged in the information or indictment, and either admitted by the defendant in open court, or found to be true by the jury trying the issue of guilt or by the court where guilt is established by plea of guilty or nolo contendere or by trial by the court sitting without a jury.

"(2) *Except where the existence of such fact was not admitted or found to be true pursuant to paragraph (1), or the court finds that a prior conviction was invalid, the court shall not strike or dismiss any prior convictions alleged in the information or indictment.*

"(3) This subdivision does not prohibit the adjournment of criminal proceedings pursuant to Division 3 (commencing with Section 3000) or Division 6 (commencing with Section 6000) of the Welfare and Institutions Code.

"(c) As used in this section, 'designated felony' means any felony specified in Section 187, 192, 207, 209, 211, 217, 245, 288, or subdivision (2), (3), or (4) of Section 261, subdivision 1 of Section 460, or when great bodily injury occurs in perpetration of an assault to commit robbery, mayhem, or rape, as defined in Section 220." (Italics added.)

[13]In *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 441-445 [134 Cal.Rptr. 650, 556 P.2d 1101], we held that the Legislature had not intended to permit trial courts to exercise discretion under section 1385 in sentencing defendants under a death penalty statute enacted subsequent to the United States Supreme Court decision in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], but in reaching that conclusion we relied heavily on pervasive indications that the Legislature had believed that any such

interpretation of section 1203.06, the lead opinion in essence concludes that the Legislature was both totally ignorant of the controlling decisions of this court and the Court of Appeal when it enacted section 1203.06 in 1975, and then engaged in a meaningless and idle act when it added subdivision (b)(2) to section 1203.08 the following year.

Although the People make much of the fact that the legislative history of section 1203.06 demonstrates that the Legislature enacted the section for the purpose of curtailing discretion previously enjoyed by trial courts, this circumstance in no way distinguishes the present case from the situation prevailing in *People* v. *Burke, supra.* As we have seen, in *Burke* our court held that the provisions of Health and Safety Code section 11712, which prescribed a mandatory *state prison* sentence for anyone convicted of a narcotics offense who had been previously convicted of a similar narcotics offense, did not prohibit a trial court from striking the prior conviction and sentencing the defendant to county jail. As the *Burke* court noted (47 Cal.2d at p. 51), section 11712 derived from a statute first enacted in 1929. (Stats. 1929, ch. 216, § 7, p. 385.) As initially enacted, the section provided that a first offender could be confined in county jail or state prison for not more than six years, and that one convicted of a second or subsequent offense could be confined in county jail or state prison from six months to ten years.[14] Thus, this initial version explicitly afforded a trial judge discretion to sentence a defendant with a prior to either county jail or state prison.

In 1935, the statute was amended to provide, inter alia, that a second or subsequent offender *"shall be imprisoned in the State prison* for not less than six months nor more than 10 years"* (italics added) (Stats. 1935, ch. 813, § 5c, p. 2208),[15] and it was this version that ultimately became

---

sentencing discretion would have rendered the statute unconstitutional under *Furman.* No similar evidence suggests that in enacting section 1203.06 the Legislature thought that removal of *all* discretion from the trial courts was necessary to sustain the constitutionality of the enactment.

[14]The 1929 legislation provided: "Any person convicted under this act for having in possession any of the drugs . . . mentioned in section 1 [including marijuana] . . . shall upon conviction for the first offense be punished by imprisonment in the county jail or in the State prison for not more than six years, for the second and each subsequent offense of which said person so convicted shall be found guilty, said person shall be punished by imprisonment in the county jail or in the State prison for not less than six months nor more than 10 years."

[15]The 1935 legislation provided: "Any person convicted under this act for having in possession any of the drugs or substances mentioned in section 1 . . . shall upon conviction be punished by imprisonment in the county jail or in the State prison for not more than six years; provided, however, that any such person convicted under this act . . . shall be imprisoned in the State prison for not less than six months nor more than ten years if such person has been previously convicted of a felony . . . , and such previous

Health and Safety Code section 11712. Although the 1935 amendment, like the enactment of section 1203.06, appears to have been specifically intended to eliminate the trial court's prior discretion to sentence a second offender to county jail, our *Burke* decision made clear that such a revision, without an explicit restriction of the section 1385 power to strike, would not preclude a trial court from striking the prior conviction. Accordingly, the *Burke* decision cannot be distinguished from the instant case.[16]

In essence, the People maintain that section 1203.06 presents a "special case" in which a trial court's section 1385 power should be curtailed because of the assertedly clear legislative intent to remove all trial court discretion in granting probation. In reality, however, acceptance of the People's argument in this case would logically preclude a trial court from striking priors or other allegations for purposes of sentencing in most of the circumstances in which the section 1385 power has traditionally been invoked.

As already noted, our decisions in *Ruiz, Navarro, Cortez, Tenorio* and *Burke* establish that "one of the paramount purposes" of a trial court's authority to strike is to enable the court in exceptional or extraordinary circumstances to render a defendant eligible for probation or for county jail or for a less severe prison sentence, *notwithstanding some other statutory sentencing provision that, standing alone, would bar such a disposition.* If section 1203.06's limitation on trial court discretion *impliedly* eliminates the court's power to strike either a use finding or a prior for purposes of granting probation, a similar unstated implication would logically flow from all other mandatory sentencing provisions and

---

conviction of a felony is charged in the indictment or information and found to be true by the jury, upon a jury trial, or found to be true by the court, upon a court trial, or is admitted by the defendant."

[16]Although the People contend that section 1203.06 is a "specific" statute which should take precedence over the more "general" terms of section 1385, it is not at all clear in this context which statute is "specific" and which "general." While section 1203.06 deals directly with the question of probation, as we have seen that section does not address the question of a trial court's power to strike. Thus, with respect to the narrow class of cases which may properly invoke the court's traditional power to strike, section 1385 may constitute the more "specific" statute, and section 1203.06 may be viewed as the provision dealing with the more "general" rule.

In any event, the provisions of section 1203.06 are clearly no more "specific" than the provisions of Health and Safety Code section 11712 at issue in *Burke,* or the provisions of section 12022.5 at issue in *Dorsey,* or, indeed, the provisions of any of the other mandatory sentencing provisions which, in the past, have not been found to work a repeal of section 1385.

would virtually eliminate the traditionally important role played by section 1385 in the sentencing context.[17]

As discussed above, we explicitly refused in *People* v. *Burke, supra,* to draw such a broad inference from similar statutory language, and instead indicated that if the Legislature intended to restrict a court's section 1385 power it should do so with unmistakable clarity. Inasmuch as section 1203.06 contains no such explicit restriction on a trial court's section 1385 power, I conclude that the trial court in the instant case retained authority to strike the use finding and to place defendant on probation notwithstanding the provisions of section 1203.06.

In sum, past California decisions have established that in light of the historically important role played by section 1385 in the sentencing process, a sentencing statute will not be interpreted as abrogating the authority accorded by section 1385 in the absence of explicit statutory language mandating that result. The Legislature, presumably aware of this well-established line of California authority, enacted section 1203.06 but failed specifically to provide that a trial court's traditional authority under section 1385 was to be eliminated in this context. Consistent with past decisions, I can only conclude that the enactment does not eliminate the trial court's power to strike under section 1385.

If the Legislature had meant to strip the courts of the powers set forth in section 1385 it should have specifically so declared. A myriad of interpretations of section 1203.06 cannot substitute for a single legislative statement that the latter section should overcome the former. Such a legislative statement is lacking, and I do not believe that we should supply or construct it, thereby arbitrarily removing a time-honored judicial function, long and universally recognized by the decisions.

Newman, J., concurred.

---

[17]For example, in *People* v. *Ruiz, supra,* we held that a trial court could strike a prior narcotics conviction so as to render a defendant eligible for probation, notwithstanding Health and Safety Code section 11370, which at that time provided that "[a]ny person convicted of violating [designated narcotics offenses] *shall not, in any case, be granted probation by the trial court or have the execution of sentence imposed upon him suspended by the court,* if he has been previously convicted of [designated narcotic offenses]." (Italics added.) Under the People's analysis, the *Ruiz* case would have unquestionably been decided differently.

**NEWMAN, J.,** Concurring.—I agree with Justice Tobriner as to the disregard for precedential cases that seems to inhere in Justice Clark's opinion. My aim in concurring separately is to explain why, even apart from those cases, the majority opinion should be regarded as *sui generis,* likely to evanish as a "legislative history" precedent affecting California's jurisprudence.

The overriding issue in this case cannot be analyzed facilely. The statutes before us are technical and complex; the legislative histories of several of them are intricate. "How To Interpret Statutes Correctly" is a subject dealt with in a million and more pages, many of them penned by first-rate jurists.

One lesson learned from those writings is that conscientious judges glean only minimal aid from so-called canons of construction; e.g., "A specific provision relating to a particular subject will govern a general provision . . . ." (See p. 521 of the maj. opn., *ante;* cf. fn. 16 of Justice Tobriner's opn.; Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed* (1950) 3 Vand.L.Rev. 395, 401.)

Valid and reliable rules of statutory interpretation do exist. Three of them ought to be stressed here. *First,* in the words of Learned Hand: "When we ask what Congress [or another legislature] 'intended', usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion." (*United States* v. *Klinger* (2d Cir. 1952) 199 F.2d 645, 648.) The distinguished justice added, "He who supposes that he can be certain of the result, is the least fitted for the attempt."[1]

*Second,* a judge should approach all legislative histories and related extrinsic aids with observable caution and care. They are data. They also are shards, too fragmented most of the time to tell us much about the whole urn or the deeds of those who helped craft it.

[1]In subsequent pages, on the basis of the record in this case, I outline what appears to have happened to Mr. Deukmejian's bill in Sacramento during the spring and summer of 1975. Via oral argument and correspondence he and other counsel were urged to help accumulate a record that would enable us to articulate as complete a narrative as possible. The scantiness of the record still, however, forfends all feeling of certainty.

*Third,* authentic interpretation requires that complete laws be examined. To use snippets from laws is perilous. "When an attorney begins to analyze possible ambiguities without a complete list of *all* statutory words that affect his inquiry, he is as vulnerable as the engineer who in his calculations relies on an incomplete formula. Sentences, sections, and whole statutes must be read from beginning to end."[2]

Here we are specially concerned with words that appear in chapter 1004 of laws the California Legislature enacted in 1975. That chapter is labeled "An act to amend Section 1203 of, and to add Section 1203.06 to, the Penal Code, relating to probation." Both those code sections are set forth verbatim; § 1203 in 107 lines; § 1203.06, 43 lines.

Section 1203.06 is the basic statute we must construe. It begins, *"Notwithstanding the provisions of Section 1203 . . .* [p]robation shall not be granted to . . . [a]ny person who used a firearm [etc.]." (The italics are mine. Justice Tobriner has set forth the full text in his fn. 4.)

The precise issue in this appeal from the trial court is whether the Legislature—even though its drafters wrote "Notwithstanding the provisions of Section 1203"—really meant to say, instead, "Notwithstanding any other provision of law". The issue arises because the Legislature has placed many probation statutes that are analogous to § 1203 and § 1203.06 in chapter 1, title 8, part 2 of the Penal Code, where § 1203 and § 1203.06 also appear. Yet most of those statutes do not mention § 1203. They rather provide that, in certain kinds of cases (not including this case), probation may not be granted "Notwithstanding any other provision of law . . . ."

Illustrating the Legislature's having distinguished between "Notwithstanding the provisions of Section 1203" and other, more comprehensive phrases is this short summary of several statutes pertaining to our analyses here:

*(A)* With § *1203.06* and § *1203.07* (both enacted in 1975), which begin "Notwithstanding the provisions of Section 1203", we must compare the adjoining § *1203.08* (enacted in 1976) and § *1203.09* (enacted in 1977), which begin "Notwithstanding any other provision of law . . . ." (See too Justice Tobriner's comments *re* § 1203.08 on pp. 533-535 of his opinion.)

---

[2]Newman and Surrey on Legislation (1955) page 645; cf. Frankfurter, *Some Reflections on the Reading of Statutes* (1947) 47 Colum.L.Rev. 527, 543: "Spurious use of legislative history must not swallow the legislation so as to give point to the quip that only when legislative history is doubtful do you go to the statute."

(*B*) With § 1202.5, which deals with theft and probation, which was enacted in 1978, and which reads "[¶] Notwithstanding the provisions of Section 1203" and "[¶2] Notwithstanding Section 1203.1", we must compare § 1170.1(g) (enacted in 1977); § 1203.14 (enacted in 1973), § 1203c (enacted in 1935), § 1208(a)[2d ¶] (enacted in 1972), and § 2601 (enacted in 1975), each of which provides "Notwithstanding any other provision of law . . . ." See too § 12032 ("Notwithstanding any provision of law or of any local ordinance to the contrary").

(*C*) Generally for words that in effect do seem parallel to "Notwithstanding any other provision of law" we must consider laws such as § 264.2 ("Probation shall not be granted [no exceptions]"); § 12311 ("No person . . . shall be granted probation"); § 337a.6 (a) and (b) and also Health and Safety Code § 11550 ("In no event does the court have the power"; cf. *People* v. *Ruiz* (1975) 14 Cal.3d 163, 166 [120 Cal.Rptr. 872, 534 P.2d 712]); and Senate Bill No. 278 (which in 1975 amended § 1203 and added § 1203.06) as it read when introduced by Senators Deukmejian and Presley on January 23, 1975. Their original § 1203(d), which allegedly allowed no exceptions, was of course changed by the Assembly's amendment of August 28, 1975, discussed below.

Enlightenment flows also from Penal Code § 4. It declares that all the code's provisions are to be "construed according to the fair import of their terms, with a view to effect its objects and to promote justice." In truth, what seems to be the fair import of "Notwithstanding the provisions of Section 1203"? Is it not that the words of § 1203.06 are to apply regardless of what the Legislature has pronounced in § 1203? To conclude that those quoted words ("Notwithstanding the provisions of Section 1203"), still unamended, import also that § 1203.06 is to override laws other than § 1203 (e.g., § 1385) seems to distort plain meaning, to extend the words so that they voice *not what the drafters intended but rather what some people now think those drafters should have intended.*

None of the opinions written by my colleagues in this case suggests that the interpretation I thus propose, limiting § 1203.06's exclusion to § 1203, would in any way obstruct the "objects" of the Penal Code or the goal of promoting "justice". Accordingly the specific tests prescribed by § 4 of that code, on how we are to construe it, have been met.

### Justice Clark's Extrinsic Aids

Justice Clark's opinion suggests that his and his majority colleagues' conclusion as to the meaning of "Notwithstanding the provisions of

Section 1203" is supported "by pertinent and timely expression of legislative intent existing when section 1203.06 was enacted" (p. 520 of the maj. opn.). He cites three documents; a Legislative Counsel "summary", a Senate committee staff memo, and a press release issued by the Governor's office. The Legislative Counsel document reads as follows:

"Existing law provides, *except in unusual cases in the interest of justice,* for denial of probation to a person convicted of robbery, burglary or arson who unlawfully was armed with a deadly weapon at the time of arrest or perpetration of the crime, or to a person previously convicted of any felony.

"Existing law also provides, *except in unusual cases in the interest of justice,* for the denial of probation to a person who is convicted of other specified felonies while unlawfully armed with a deadly weapon, or convicted of a crime in which a deadly weapon is used or attempted to be used or in which great bodily injury is inflicted or convicted, or who has been twice previously convicted of felonies, and for various other crimes.

"This bill would revise these provisions so that (1) probation and suspension of sentence would be denied, *without any exception in unusual cases in the interest of justice,* to any person who uses a firearm during the commission of various felonies, including murder, robbery, first degree burglary, prison escape, and various assaults, rapes and kidnappings, but probation would not be denied in such cases solely on the ground of being unlawfully armed with a firearm in the absence of use as specified above; (2) probation and suspension of sentence would be denied, *without any exception in unusual cases in the interest of justice,* to any person who is previously convicted of such felonies while armed during the commission of any subsequent felony or unlawfully armed at the time of arrest instead of being denied on the ground of a previous conviction of any felony; and (3) this bill would retain the provisions for denial of probation, *except in unusual cases in the interests of justice,* but would limit the application of such provisions as they presently relate to using, attempting to use, or being unlawfully armed with deadly weapons, in cases other than where a person was previously convicted once of any felony, to deadly weapons other than firearms.

"This bill would also delete an existing provision, which is inoperative, relative to the requirement of the concurrence of the district attorney for the grant of probation in certain cases." (Italics added.)

Those four paragraphs were printed with the bill when it was introduced on January 23, 1975. Not one word was altered or added by the Legislative Counsel when the bill was amended in the Senate on May 13 and again, in the Assembly, on August 28. *The phrase that concerns us, "Notwithstanding the provisions of Section 1203", was not included in the bill until the Assembly passed its August 28th amendment.*

Why did the Legislative Counsel not revise his summary after the August 28th amendment? Possibly he and his staff were much too busy during the final, hectic days of that legislative session. A juridical explanation, however, is that no revision was appropriate. Why not? Because the four paragraphs quoted above suggest that the Legislative Counsel, from January 23 on, regarded the bill as nothing more than an amendment to § 1203. Why is that so? Because both the January 23 and the May 13 versions of the bill were labeled "An act to amend Section 1203 of the Penal Code, relating to probation"; and when words of the proposed amendment were, on August 28, removed from § 1203 and utilized to create § 1203.06, the only pertinent change was to add, at the beginning of § 1203.06, "Notwithstanding the provisions of Section 1203 . . . ."

What did the Legislative Counsel mean when he said "without any exception in unusual cases in the interest of justice"? (See the words italicized in parts (1) and (2) of his third paragraph quoted above.) Apparently what he meant was that the exclusion from § 1203 of "unusual cases in the interest of justice" would not apply. (See the words italicized in paragraphs 1 and 2 quoted above, and also part (3) of the third paragraph.) His phrase "[e]xisting law", in paragraphs 1 and 2, refers to § 1203 only. *It does not refer to § 1385 or to the line of cases discussed in Justice Tobriner's opinion.*

*The Senate Committee Staff Memo*

Justice Clark says that the Legislative Counsel's paragraphs are consistent with a staff memo stating that the bill (apparently as introduced on Jan. 23) "Prohibits, *without exception*, the granting of probation to persons who have carried or used firearms in connection with certain crimes, for which probation may be obtained under existing law in unusual cases in the interests of justice." Unfortunately that quotation has been bobtailed. The memo appears in appendix B of the Attorney General's brief filed on October 8, 1976. As therein set forth its opening paragraph reads: "Prohibits, *without exception*, the granting of

probation to persons who have carried or used *firearms,* in connection with certain crimes, for which probation *may be* obtained under existing law in unusual cases in the interests of justice (paras. (1) & (2), subd. (d), Sec. 1203, Pen. C.)."

What is the significance of that closing citation "(paras. (1) & (2), subd. (d), Sec. 1203, Pen. C.)", which is not mentioned in the majority opinion? It tells us that *the writer of the Senate committee memo, like the Legislative Counsel, was concerned with § 1203 only.* His reference was to the existing § 1203(d) and its exclusion of "unusual cases in the interest of justice". Nothing in the six-page memo or in any other document suggests that the writer or the Senate committee ever considered the impact of the August 28th amendment on § 1385 or on the cases stressed by Justice Tobriner. (See the memo's full text in annex A, *infra.* The words "*without exception*" in comment 2 on page 553 clearly involve the reference in comment 1 on page 552 to § 1203(d)'s exclusion ("*Except* in 'unusual cases' where probation would serve 'the interests of justice' "). No words in the memo express or imply any knowledge of or concern with any other Penal Code section.[3])

### The Governor's Press Release

The press release from which Justice Clark quotes appears in appendix A of the Attorney General's brief filed on October 8, 1976. (It is also in annex B, *infra.*) It indicates that the Governor with some vehemence did declare his views on "those who use guns to commit crimes". Yet none of its words indicates that the Governor or his advisers had *any* knowledge regarding legislative intention with respect to the crucial phrase "Notwithstanding the provisions of Section 1203". The press release, like the Legislative Counsel document and the Senate committee memo,

---

[3]Justice Clark's fourth footnote quotes one sentence from an American Civil Liberties Union letter of September 18, 1975 to the Governor. A reading of the entire letter (see annex C, *infra*) discloses that its writer, like the Senate memo's writer, was discussing § 1203 only. (See, e.g., the ACLU letter's fifth paragraph.) Also of interest is that the ACLU merited no mention in the "HISTORY" paragraph that introduces the Senate memo as follows:

"Source: Attorney General

"Prior Legislation: SB 237 (1973)—held in Assembly
 Committee on Criminal Justice

"Support: Calif. D.A.'s & P.O.'s Ass'n; Hueneme
 Bay Republican Women, Federated; Irate
 Taxpayers Committee

"Opposition: Calif. Probation, Parole, & Correctional
 Ass'n; Chief Probation Officers Ass'n.
 of Calif; Calif. Public Defenders Ass'n."

evidences no official concern whatsoever that affects the August 28th amendment or § 1385 or Justice Tobriner's cases. (See too the second paragraph of Justice Tobriner's fn. 6.)

*Other Extrinsic Aids*

Counsel have referred us to a congeries of other documents, some of which merit comment. Consider, for instance, the Attorney General's letter of March 14, 1979, which reads in part: "[W]e invite the court's attention to the view of Alan Sieroty, Chairman of the Assembly Committee on Criminal Justice in a colloquy with Louis Katz, an attorney from San Diego, representing the Criminal Defense Lawyers (see attachment—excerpts from hearing, *supra*). This makes it clear that the chairman of the committee understood that the discretion of the court to strike the allegation had been eliminated. This is consistent with all of the legislative history presented to the court, and although it is a view expressed subsequent to the passage of the legislation, it may be considered."

That is a puzzling inference. The paraphrased colloquy was reported as follows (italics added): "CHAIRMAN SIEROTY: An armed robbery case, Mr. Katz, is kind of interesting. Under our law now, the judge would have no discretion to grant them probation.

"MR. KATZ: That's right; under SB 42.

"CHAIRMAN SIEROTY: No, under 287, was it? 278. That man would go to prison. He would not have any opportunity for probation. The only opportunity would be that you could convince the district attorney, as to what to say, and he might change the charge, or something else.

"MR. KATZ: Well, if they strike the allegation . . .

"CHAIRMAN SIEROTY: Strike the allegation of utilization of a weapon in robbery. *Then there would be a different situation.* So what that bill has done is to change who exercises the discretion?

"MR. KATZ: The district attorney instead of the judge.

"CHAIRMAN SIEROTY: That's right. That is what I see happening in this process.

"MR. KATZ: And that's what really concerns me that the charging authority, the district attorney, will have the power to decide who does, or doesn't, go to prison. Without the benefit of the Judicial System, the district attorney relies on the police report, and true, he has, maybe, the man's past record, but then about how he charges the defendant is deciding either he goes to trial, or how the man is going to be sentenced, because if they charge an allegation of being armed, the judge has no discretion, and this is the thing we're concerned about. . . ."

What exactly was meant by the chairman's words, "Strike the allegation of utilization of a weapon in robbery. *Then there would be a different situation.*"? The only justifiable inferences, I submit, are (1) that both the chairman and Mr. Katz indeed did know about the § 1385 exception, and (2) that the chairman regarded "strike" cases as "different", relevant generally perhaps but nonetheless beyond the scope of his on-going inquiry into Senate Bill No. 278, § 1203, and § 1203.06.

There are also letters from the Attorney General to the Assembly and its committee, to the Senate committee, and to the Governor. I have appended them here (as annexes D, E, F, G) *first,* because starkly they decorate footnote 8 in Justice Tobriner's opinion;[4] and *second,* because it will be seen that none of them contains any hint that its author's concerns in any way extended beyond ". . . the provisions of Section 1203".

## "Subsequent" Legislative History

Readers may recall that the excerpt above from the Attorney General's letter of March 14, 1979 recounts "a view expressed subsequent to the passage of the legislation". Among many views like that one which might have affected our holding, most were expressed and commented upon during recent months—on TV and radio, in dispatches, editorials, letters to the editor, in tavern and town. The politicization of this proceeding

---

[4]Also supplementing Justice Tobriner's opinion, albeit informally and not warrantably, are these comments reported in the Metropolitan News of April 19, 1979 (p. 2): "Deputy Dist. Atty. Maurice Oppenheim, who argued the case the first go-around for the District Attorneys Assn. (as amicus curiae), said that Atty. Gen. George Deukmejian showed 'unsurpassed ineptness as a state senator in drafting the 'use a gun, go to prison' law. [¶] He said that *Deukmejian, though the 'foremost expert on criminal law' in the Legislature and a 'card-carrying lawyer,' had 'ignored all the prior cases' on judicial powers in drafting the bill."* (Italics added.)

A letter of September 22, 1977 to this court from Mr. Maurice Oppenheim states, with respect to a brief he had filed, "[T]he sentence reads, 'Purity is not often an impediment of successful legislation.' It should be corrected to read, 'Purity is not always an ingredient of successful legislation.' "

after the summer of 1978 became phantasmagoric. A shrill, clamorous campaign—inspired and nurtured by experienced, well-financed, ambitious, and posse-like "hard on crime" advocates—has had a still incalculable but dismal impact on the judicial process in California.

As first presented to the Court of Appeal and then to us, this case might have been a useful vehicle for a much-needed examination of questions involving subsequent legislative history and its proper use by courts. In our letter of February 20, 1979 to counsel we sought comment on "the advisability of utilizing post hoc legislative declarations in litigation generally". (See annex H, *infra*.)

Regrettably that needed examination will have to be postponed. Its essential focus has been caricatured, somewhat bizarrely, in several briefs and other statements made before, during, and after oral argument on rehearing here. Thus it is not timely yet for us to reweigh this oft-quoted dictum in *Hilder* v. *Dexter* (1902) A.C. 474, 477: "My Lords, I have more than once had occasion to say that in construing a statute I believe the worst person to construe it is the person who is responsible for its drafting. He is very much disposed to confuse what he intended to do with the effect of the language which in fact has been employed."[5] See part II of the State Public Defenders's amicus brief filed on March 2, 1979 ("The statement in the Condit and Hanelt brief regarding legislative intent is unreliable and irrelevant to this case and should not be considered by this court"); Final Report of the Subcommittee on Legislative Intent of the Assembly Committee on Rules (1963) *seriatim*; Forsyth, *Declaratory Legislation in California* (1948) 36 Cal.L.Rev. 634; Dickerson, The Interpretation and Application of Statutes (1975) page 181: "[T]he court's general duty of deference to the legislature would in many cases be better served by acting consistently with the enacted will of the Legislature than by acting consistently with the unenacted later will, despite the fact that the unenacted expression of intent was the more recent legislative expression."

---

[5]Cf. the Attorney General's "remarks . . . prepared for delivery . . . at oral argument" in the Metropolitan News, March 8, 1979; also his *Should the Court Lift Its "Use a Gun, Go to Prison" Ruling? Yes: Judicial Leniency Is Rampant,* Los Angeles Times (Mar. 4, 1979)·part V, paragraph 1: "My colleagues and I obviously intended to take away the discretion of the judges . . . because of the history of judicial abuse associated with them."

That last reminiscence should be contrasted with the following quotation from the Assembly File Analysis supplied to the office of the Attorney General by the Legislative Counsel on March 13, 1979: "The [predecessor] Attorney General admitted there is no statistical evidence that judges have abused discretion in granting probation in those cases

Finally, because in years ahead the chroniclers of this rehearing and of the whole melancholy tale may lack awareness of pertinent events and diverse pressures that have become so tangled, I think that I should review briefly some of the November 1978 to June 1979 developments regarding § 1203.06.

The trial court's critical action here was during July 1976. On July 21, 1977, after the Court of Appeal had reversed that action, we granted a hearing; and oral argument was heard on February 6, 1978. Tutored and harsh comment began to appear at least as early as June 1978. (See Nicholson, *People v. Tanner: An Update,* L.A. Daily J. Rep. (Jan. 24, 1979) p. 4, at p. 6; cf. Nicholson & Condit, *The Ultimate Human Right,* Met. News (May 23, 1978) p. 2.)

During 1977 and 1978 the Legislature could of course have amended the law. In § 1203.06 the phrase "Notwithstanding the provisions of Section 1203" could have been replaced by "Notwithstanding any other provision of law", "With no exceptions", or similar words. Except for a perplexing attack by the Republican gubernatorial candidate on October 10 and 11, 1978, however, the hullabaloo did not begin till November 1978. "If the State Supreme Court throws out California's law mandating prison terms for criminals who use guns, Governor Brown said . . . he will lead a fight to reinstate that law. 'We will have mandatory prison sentences if I have to write the new law or a new amendment to the Constitution,' Brown said." (S. F. Chronicle, Nov. 9, 1978.) In early December, "Attorney General-elect George Deukmejian pledged to lead the fight to reinstate mandatory prison sentencing laws if they are overturned by the state Supreme Court." (L. A. Daily J., Dec. 5, 1978.) "A freshman Assemblyman . . . proposed a constitutional amendment in anticipation of a controversial Supreme Court decision that may overturn a state sentencing law." (The Recorder, Dec. 13, 1978.)

This court's initial opinions were filed on December 22. "In Sacramento, Governor Brown reacted sharply . . . . [B]oth Brown and . . . Deukmejian promised to push for reinstatement of the mandatory prison penalty for gun-wielding criminals . . . ." (This World, Dec. 31, 1978.) The San Francisco Chronicle editorialized: "This law . . . must be

covered by AB 289 [a companion bill to Mr. Deukmejian's bill]. This was confirmed by the Bureau of Criminal Statistics."

See too State Bar Rules of Professional Conduct, rule 7-105(1): "A member of the State Bar shall refrain from asserting his personal knowledge of the facts at issue, except when testifying as a witness." Cf. *Lascher at Large* in 54 State Bar J. (1979) page 172, column 3.

re-enacted . . . . And it must be drawn in such a way that the California Supreme Court will have no leg to stand on if it should set out again to override the undoubted will of the people." (Sunday Punch, Dec. 31, 1978.) "Sen. Jerry Smith . . . said he saw no or little resistance to passage of the measure, since 'all legislators feel strongly about this.' " Also, "[t]o help expedite matters Smith . . . received permission by a unanimous vote of the upper house to hold a hearing on the measure . . . next Tuesday [Jan. 9]". (S. F. Examiner, Jan. 3, 1979.)

By that time the Governor seemingly had found that other matters were for him more pressing. "The leadoff witness in favor of the measure was newly inaugurated Republican Atty. Gen. George Deukmejian", and the committee endorsed the bill unanimously. (L. A. Times, Jan. 10, 1979.) Two days later it passed the Senate unanimously.[6]

Meanwhile, back at the Assembly committee where doubts had been expressed at a first meeting on January 8, the inquiry attracted notably fewer media people than did the Senate proceedings. Yet the questions raised there did seem more penetrating and perceptive, and several editorialists began to pronounce their second thoughts. See, e.g., page 6 of part II of the January 11th Los Angeles Times: "Now that the controversy over the Supreme Court's decision has abated somewhat, the Legislature should take the time required to carefully debate a new statute. The . . . law must be just, and must have some flexibility to provide for the 'extraordinary cases' cited by Tobriner."

Committee action eventually was postponed, and the prospect of new legislation is blurred. See the San Francisco Banner's *Assembly to bypass all sentencing bills . . .* , May 4, 1979 ("labeled a 'death wish' by Michael Rushford, director of the California Chamber of Commerce Anti-Crime Department"); also the related dispatch from Sacramento in The Recorder, May 10, 1979 ("the Assembly Criminal Justice Committee yesterday approved two moderate measures on dangerous mentally ill offenders, but killed other, tougher sentencing proposals"). Concerning the views of "George Nicholson, a former Alameda County prosecutor who lobbies for the California District Attorneys Association, and Rod

---

[6]In its lead story regarding happenings on the Senate floor the San Francisco Chronicle, January 12, 1979, page 1, reported: " 'Perhaps we can tattoo it across the forehead of the court,' snarled conservative Senator H. L. Richardson, R-Arcadia.". Cf. Nugent, *Removal of Judges by Legislative Action* (1979) 6 J.Legis. 140, 142, fn. 24: "In 1786, the Superior Court of Rhode Island ruled a statute unconstitutional . . . . In a fit of legislative pique, the lawmakers attempted to impeach the court. The impeachment effort failed, but the judges of the court somehow failed re-election at the next session."

Blonien, chief legislative lobbyist for Attorney General George Deukmejian," the San Francisco Examiner had earlier reported (Feb. 7, p. 5) that "their hope for an omnibus blanket for all mandatory terms is bogging down, as a legislative staff review of these laws begins to turn up inconsistencies and anomalies."[7]

As noted above, all that seemed needed during the months that have followed December 22, 1978 was a simple amendment that replaced "Notwithstanding the provisions of Section 1203" with "Notwithstanding any other provision of law" or an equivalent phrase. To date, the Assembly's representatives have chosen not to observe the many *ex cathedra* edicts typified by the quote on my preceeding pages 547-548 from the San Francisco Chronicle, as well as these words from the San Francisco Examiner (Dec. 27, 1978): "The Legislature should make its intent so clear on this law that that issue never again could be raised by this court. And it should make achievement of the goal Act I as it assembles to face the tasks of the New Year."

### Conclusion

The incumbent Attorney General has advised as to what he and his colleagues "obviously intended". Justice Clark's opinion pronounces that "the Legislature has not assisted us in discerning its intent".

With greater perception Justice Tobriner states, "The legislative disapproval of the trial court's pre-1975 probation practice . . . is by no means irreconcilable with a legislative decision to leave the trial courts' section 1385 power intact; the Legislature may well have desired to disapprove the trial courts' quite liberal pre-1975 probation practice without completely stripping such courts of their traditional power to strike allegations or findings in the truly extraordinary or exceptional case. [¶] Indeed, the lead opinion's ultimate determination to relieve Tanner of a prison sentence is eloquent testimony to the strength of the traditional, underlying judicial policies in this area, recognizing that exceptional circumstances—unforeseen by the Legislature—may in rare cases warrant a departure from a generally appropriate sentence."

---

[7] Cf. *Prison crowding shadows sentencing conditions* (May 1979), State Bar Rep. Instructive as to how, if votes have been corralled, the whole Legislature can respond immediately and without ruffles and flourishes is Senate Bill. No. 1476, which on August 21 and August 25, 1978, respectively, passed the Assembly and Senate after this court's four-to-three decision on July 31, 1978 in *People* v. *Peters*, 21 Cal.3d 749 [147 Cal.Rptr. 646, 581 P.2d 651]. (At the end of September, interestingly it was vetoed by the Governor.)

I share those views, and that four colleagues have not felt impelled to explain fully their reasons for disagreement is saddening. My own discussion has converged on evidence regarding the Assembly's crucial amendment of August 28, 1975. That evidence, I believe, supports a finding that influential legislators who helped guide the final vote desired to restrict the discretion conferred by § 1203 but to retain the discretion conferred by § 1385. At first glance the former section's stress on "the interests of justice" seems like the latter's requirement that trial court action be "in furtherance of justice". Analysis of the legislative and judicial histories helps prove, though, that the aims as well as the applications of the two sections have differed significantly.

## ANNEX A

**SENATE COMMITTEE ON JUDICIARY** 1975-76 REGULAR SESSION

SB 278 (Deukmejian) S
As introduced B
Penal Code
 2
 DENIAL OF PROBATION 7
 -USE OF FIREARMS- 8

### HISTORY

Source: Attorney General

Prior Legislation: SB 237 (1973) - held in Assembly
 Committee on Criminal Justice

Support: Calif. D.A.'s &.P.O.'s Ass'n; Hueneme
 Bay Republican Women, Federated; Irate
 Taxpayers Committee

Opposition: Calif. Probation, Parole, & Correctional
 Ass'n; Chief Probation Officers Ass'n.
 of Calif; Calif. Public Defenders Ass'n.

### DIGEST

Firearms

Prohibits, <u>without exception</u>, the granting of pro-
bation to persons who have carried or used <u>firearms</u>,
in connection with certain crimes, for which probation
<u>may be</u> obtained under existing law in unusual cases in
the interests of justice (paras. (1) & (2), subd. (d),
Sec. 1203. Pen. C.).

Requires that such facts as would make a person in-
eligible for probation under this bill must be alleged
in the indictment or information, and either admitted
by the defendant in court or found to be true by the
jury or, in certain cases, by the judge (para. (1),
subd. (e), Sec. 1203, Pen. C.).

Defines "used a firearm" and "armed with a firearm,"
for the purposes of this bill (paras. (2) & (3),
subd. (e), Sec. 1203, Pen. C.).

ANNEX A—continued

SB 278 (Deukmejian) S
Page Two B

Other Laws 2
 7
Requires that, when a court grants probation in a 8
case in which it is ordinarily denied, on the statu-
tory grounds that it would serve "the interests of
justice," the court specify on the record the circum-
stances indicating that the interests of justice would
best be served by the granting of probation (para. (8),
subd. (f), Sec. 1203, Pen. C.).

Deletes an existing provision, which has been held to
be unconstitutional, relating to the requirement of
the concurrence of the district attorney for the
granting of probation in certain cases (subd. (e),
Sec. 1203, Pen. C.).

### PURPOSE

Prohibit, without exception, the granting of pro-
bation to persons who use or carry firearms in the
perpetration of certain crimes.

Require documentation of the grounds for granting
probation in certain other cases.

### COMMENT

1. Except in "unusual cases" where probation would
 serve "the interests of justice," Section 1203
 of the Penal Code presently prohibits the
 granting of probation to the following persons:

 (a) Persons unlawfully armed with a deadly
 weapon at the time of the perpetration
 of, or arrest for, any of the following
 crimes:

 (1) Robbery.

 (2) Burglary.

 (3) Arson.

 (4) Burglary with explosives.

 (5) Rape with force or violence.

 (6) Murder.

## ANNEX A—continued

SB 278 (Deukmejian) S
Page Three B

 (7) Assault with intent to 2
 commit murder. 7
 8

 *(8) Attempt to commit murder.*

 *(9) Trainwrecking.*

 (10) Kidnapping.

 (11) Escape from state prison.

 (12) Conspiracy to commit any of the offenses listed above.

(b) Persons who <u>used</u> <u>or</u> <u>attempted to·use</u> <u>a deadly</u> <u>weapon</u> in <u>connection with</u> <u>the</u> perpetration of <u>any</u> crime.

(c) Persons with <u>any previous</u> <u>felony convictions</u>.

(d) Persons who willfully inflict great bodily injury or torture in the perpetration of <u>any</u> crime.

(e) Public officials taking part in bribery, embezzlement, or extortion.

2. This bill would prohibit the granting of probation, <u>without</u> <u>exception</u>, to any of the *following persons:*

 (a) Any person <u>armed</u> with a <u>firearm</u> at the time of the <u>perpetration of</u>, or arrest for, <u>any</u> <u>crime, and</u> who had been <u>previously</u> <u>convicted</u> of any of the following offenses:

 (1) Murder.

 (2) Assault with intent to commit murder.

 (3) Robbery.

ANNEX A—continued

SB 278 (Deukmejian) S
Page Four B

 (4) Kidnapping. 2
 7
 (5) Burglary of the first degree. 8

 (6) Certain rape offenses.

 (7) Assault with intent to commit rape, sodomy, or robbery.

 (8) Escape.

(b) Any person using or attempting to use a firearm in the perpetration of any of the offenses listed above.

3. To conform to the changes it makes with respect to firearms, this bill has limited the applicability of existing provisions concerning deadly weapons to deadly weapons other than firearms. In doing so, it seems to inadvertently remove some crimes altogether from any provision limiting or prohibiting probation. Examples follow:

 (a) Under existing law, any person who uses any deadly weapon in the perpetration of any crime may not be granted probation except in unusual cases.

 Under this bill, a person who used a firearm in the perpetration of any crime other than those specifically enumerated in the bill would not come within any provision limiting or prohibiting probation.

 (b) Under existing law, a person who is armed with any deadly weapon at the time of the commission of arson or trainwrecking may not be granted probation except in unusual cases.

ANNEX A—continued

SB 278 (Deukmejian) S
Page Five B

> Under this bill, a person who is armed 2
> with a firearm at the time of the 7
> commission of arson or trainwreking 8
> would not come within any provision
> limiting or prohibiting probation.

4. According to a study of 3 counties (Alameda,
San Francisco, and part of Los Angeles) by the
Bureau of Criminal Statistics in the first
half of 1973, 27% of those persons who had
used or been armed with firearms in connection
with the commission of violent crimes received
straight probation; 33% received probation
and jail.

Other findings from the study included the
following:

> (a) The incidence of firearm involvement
> in 6 major crime categories:
>
>> (1) Homicide: 57%
>>
>> (2) Robbery: 54%
>>
>> (3) Assault: 41%
>>
>> (4) Burglary: 21%
>>
>> (5) Grand theft: 21%
>>
>> (6) Forcible rape: 9%
>
> (b) Disposition, by crime, of cases involving
> firearms:

ANNEX A—continued

SB 278 (Deukmejian)
Page Six

| CRIME | PRISON | PROBATION | | |
|---|---|---|---|---|
| | | TOTAL | STRAIGHT | PROB+JAIL |
| Homicide | 62.3% | 37.7% | 13.0% | 24.7% |
| Robbery | 60.6% | 39.4% | 11.9% | 27.5% |
| Assault | 17.9% | 82.1% | 42.1% | 40.0% |
| Burglary | 33.3% | 66.7% | -0- | 66.7% |
| Grand theft-person | 5.3% | 94.7% | 42.1% | 52.6% |
| Forcible rape | 33.3% | 66.7% | 33.4% | 33.3% |

6. In its present form, Section 1203 requires the
 concurrence of the district attorney before a
 court can grant probation to persons convicted
 of certain crimes. This provision has been held
 invalid as an unconstitutional violation of
 separation of powers.

 This bill would delete this provision, and a
 related provision which is now superfluous.

7. Technical Amendment

 On page 6, line 32, strike out "(8)" and
 insert "(g)"

 On page 6, line 33, strike out "this subdivision"
 and insert "subdivision (f)"

 On page 6, line 36, strike out "(g)" and
 insert "(h)"

 On page 7, line 4, strike out "(h)" and
 insert "(i)"

 ******

## Annex B

[Sept. 23, 1975]

"Gov. Edmund G. Brown Jr. signed legislation today imposing mandatory prison sentences for using a firearm in the commission of crimes ranging from robbery to attempted murder.

"The governor also signed a bill increasing the waiting period from five to 15 days before a person purchasing a handgun can take delivery of the weapon.

"In a statement on the mandatory sentence bill, Brown said, 'By signing this bill, I want to send a clear message to every person in this state that using a gun in the commission of a serious crime means a stiff prison sentence.

"'Whatever the circumstances, however eloquent the lawyer, judges will no longer have discretion to grant probation even to first offenders. This may not rehabilitate nor get at the underlying causes but it will punish those who deserve it. The philosophy of this bill is based not on sociology or Freudian theory, but on simple justice.

"'Recent events underscore the appropriateness of swift and sure punishment for those who use guns to commit crimes.'

"Enactment of the legislation gives California its first mandatory sentence law in 10 years.

"The bill (SB 278) by Sen. George Deukmejian, R-Long Beach, requires mandatory prison terms for the use of firearms in the following crimes:

"Murder; assault with intent to commit murder; robbery; kidnaping; kidnaping for ransom, extortion or robbery;

(i)

## ANNEX B—continued

first degree burglary; rape by force or violence; rape by threat of great and immediate harm; assault with intent to commit rape or robbery or prison or jail escapes.

"The measure defines use of a firearm as displaying a firearm in a menacing manner, intentionally firing it or intentionally striking a person with it.

"The new law is supported by Attorney General Evelle Younger, and the California Peace Officers' and District Attorneys' Associations.

"It passed the Senate on a 31-3 vote and the Assembly on a 68-9 vote. The last mandatory sentence law in California also involved the commission of crimes with firearms. . . ."

ANNEX C

american civil liberties union of
northern california

1220 "H" street, suite 103, sacramento, ca. 95814
916/442-1036

LEGISLATIVE OFFICE
BRENT A. BARNHART,
 LEGISLATIVE REPRESENTATIVE

September 18, 1975

Paul N. Halvonik
Assistant to the Governor
 for Legislative Affairs
State Capitol
Sacramento CA 95814

Re: SB 278

Dear Paul:

We wish to register a strong dissent to the enactment of SB 278. Like
all other citizens of the state, we are aware of the serious problems
which the expanding use of firearms poses in California. However, we
think that SB 278, as well as other efforts to create mandatory sentences,
poses an unacceptable solution.

The Legislature in enacting such legislation is presuming omniscience:
predicting that in no case will probation, even conditioned on jail time,
ever be an acceptable alternative. Thus not even a very old person or
one afflicted with a fatal disease or in need of regular treatment such
as kidney dialysis would be eligible for probation.

Due process does not end upon conviction. The proper situs for deter-
mination of a convicted person's sentence is at the trial court, not
in Sacramento; essential fairness requires that sentence be based on
teh facts and circumstances of the case submitted to the court and on
the person's own merit or lack of merit.

Mandatory sentences represent another facet of depersonalization by
overreaching government - of legislative machinery applying superficial
solutions to problems of real depth and complexity.

Existing law already provides that in cases involving specified crimes,
no probation shall be granted "except in unusual circumstances where
the interests of justice demand it." Proponents of mandatory sentencing
claim that this has not stopped judges from being soft on criminals, and
so probation must be precluded altogether. The other conclusion - that
the presumption of no probation has had no effect whatsoever in stopping
violent crime - does not seem to have occurred to proponents of mandatory
sentencing.

RICHARD DeLANCIE, CHAIRPERSON, NANCY McDERMID, DOROTHY PATTERSON, HELEN SALZ, VICE CHAIRPERSONS, DAVIS RIEMER
SECRETARY TREASURER, COLEMAN A. BLEASE, EPHRAIM MARGOLIN, GENERAL COUNSEL, CHARLES C MARSON, LEGAL DIRECTOR,
JOSEPH REMCHO, STAFF COUNSEL, MICHAEL CALLAHAN PUBLIC INFORMATION DIRECTOR

## ANNEX C—continued

Paul N. Halvonik Page 2 September 18, 1975

It is our position that SB 278 will do nothing to halt the increase in violent crimes in which firearms are used, but it will do significant harm to the rights of the criminally accused. We understand that there is strong public pressure to sign SB 278, but we would submit that good sense and a rational perspective place this measure outside the acceptable alternatives of a wise government.

Very truly yours,

Brent A. Barnhart
Legislative Representative

BAB:MWI
cc: Hon. George Deukmejian
 Hon. Alfred H. Song
 Hon. Alan Sieroty

## ANNEX D

LVELLE J YOUNGER
ATTORNEY GENERAL

**STATE OF CALIFORNIA**

OFFICE OF THE ATTORNEY GENERAL

### Department of Justice

555 CAPITOL MALL, SUITE 550
SACRAMENTO 95814

March 25, 1975

Sent to Senate Judiciary Committee Members

This is to ask that you support Senate Bill 278 (Deukmejian) which will be heard before the Senate Judiciary Committee on April 8.

Senate Bill 278 mandates that persons convicted of certain violent crimes in which. they used or were armed with a firearm actually be committed to state prison. It does this by removing the trial court's authority to grant probation in such cases.

We believe that Senate Bill 278 is needed because:

1. Under existing law probation is too often granted to persons who used or were armed with firearms during the course of such violent crimes as murder, robbery, and rape. A Bureau of Criminal Statistics special study which surveyed the Counties of Alameda, San Francisco, and Los Angeles found that an average of 60.8% of those persons convicted of serious crimes involving the use of firearms were granted probation or probation plus county jail time. A detailed summary of the study is enclosed for your information.

ANNEX D—continued

-2-

2. The granting of probation in cases in which the felon has seriously endangered the lives of others by using a firearm substantially weakens our ability to deter criminal use of firearms. The deterrent effect of such laws as Penal Code section 12022 and Penal Code section 12022.5 is nil when the convicted felon knows that he has a 6 out of 10 chance of avoiding an actual prison term.

We believe that the certainty of punishment is a significant deterrent to certain criminal acts. We believe this is especially true when a person weighs the option of using a firearm during a planned robbery or other serious felony. We urge that you approve SB 278 and establish a standard of strict liability for those who care so little about the lives of others that they are prepared to endanger them at the point of a gun.

Very truly yours,

EVELLE J. YOUNGER
Attorney General

MICHAEL FRANCHETTI
Deputy Attorney General

cc: Senator George Deukmejian
ds

## ANNEX E

EVELLE J. YOUNGER
ATTORNEY GENERAL

STATE OF CALIFORNIA

OFFICE OF THE ATTORNEY GENERAL

### Department of Justice

555 CAPITOL MALL, SUITE 550
SACRAMENTO 95814

August 7, 1975

To Members & Consultant, Assembly Criminal Justice Committee

This is to ask that you support Senate Bill 278 (Deukmejian) which was passed by the Senate by a vote of 31-3.

Senate Bill 278 mandates that persons convicted of certain violent crimes in which they use or were armed with a firearm actually be committed to state prison. It does this by removing the trial court's authority to grant probation in such cases.

We believe that Senate Bill 278 is needed because:

1. Under existing law probation is too often granted to persons who used or were armed with firearms during the course of such violent crimes as homicides, robbery, and rape. A Bureau of Criminal Statistics study recently surveyed the counties of Alameda, San Francisco, and Los Angeles. It found that an average of 60.8% of those persons convicted of serious crimes involving the use of firearms were granted probation or probation plus county jail time. A detailed summary of the study is enclosed for your information.

2. The granting of probation in cases in which a felon has seriously endangered the lives of others by using a firearm substantially weakens our ability to deter criminal use of firearms. The deterrent effect of

-2-

such laws as Penal Code section 12022 and Penal Code section 12022.5 (which require additional prison time if firearms are used) is nil when the convicted felon knows he has a good chance of avoiding an actual prison term.

We believe that certainty of punishment is a significant deterrent to certain criminal acts. We believe this is especially true when a person waives the option of using a firearm during a planned robbery or other serious felony. We urge that you approve SB 278 and establish a standard of strict liability for those who care so little about the lives of others that they are prepared to endanger them at the point of a gun.

Very truly yours,

EVELLE J. YOUNGER
Attorney General

MICHAEL FRANCHETTI
Deputy Attorney General

Enclosure
cc: Senator Deukmejian
ds Tom Clarke, Consultant, C.J. Comm.

 bcc: Stevens, McBrien, Gates

## ANNEX F

EVELLE J. YOUNGER
ATTORNEY GENERAL

STATE OF CALIFORNIA

OFFICE OF THE ATTORNEY GENERAL

### Department of Justice

555 CAPITOL MALL, SUITE 550
SACRAMENTO 95814

August 26, 1975

TO: Members, State Assembly

This is to ask that you support Senate Bill 278 (Deukmejian) which was passed by the Senate on a vote of 31-3, and which was approved by the Assembly Criminal Justice Committee.

Senate Bill 278 mandates that persons convicted of certain violent crimes in which they used a firearm actually be committed to state prison. It does this by removing the trial court's authority to grant probation in such cases.

We believe that Senate Bill 278 is needed because:

1. Under existing law probation is too often granted to persons who used firearms during the course of such violent crimes as homicide, robbery and rape. A Bureau of Criminal Statistics study recently surveyed the Counties of Alameda, San Francisco and Los Angeles. It found that an average of 60.8% of those persons convicted of serious crimes involving the use of firearms were granted probation or probation plus county jail time. A detailed summary of the study is enclosed for your information.

ANNEX F—continued

-2-

2. The granting of probation in cases in which a felon has seriously endangered the lives of others by using a firearm substantially weakens our ability to deter the illegal use of firearms. The deterrent effect of such laws as Penal Code section 12022 and Penal Code section 12022.5 (which require additional prison time if firearms are used) is nil when the convicted felon knows he has a good chance of avoiding an actual prison term.

We believe that certainty of punishment is a significant deterrent to certain criminal acts. We believe this is especially true when a person considers the option of using a firearm during a planned robbery or other serious felony. We urge that you approve Senate Bill 278 and establish a standard of strict liability for those who care so little about the lives of others that they are prepared to endanger them at the point of a gun.

Very truly yours,

EVELLE J. YOUNGER
Attorney General

MICHAEL FRANCHETTI
Deputy Attorney General

Enclosure
cc: Senator George Deukmejian
ds

## ANNEX G

EVELLE J. YOUNGER
ATTORNEY GENERAL

STATE OF CALIFORNIA

OFFICE OF THE ATTORNEY GENERAL

### Department of Justice

555 CAPITOL MALL, SUITE 550
SACRAMENTO 95814

## SEP 1 0 1975

The Honorable Edmund G. Brown, Jr.
Governor, State of California
State Capitol
Sacramento, California 95814

Dear Governor Brown:

This is to ask that you sign into law Senate Bill 278
(Deukmejian) which was recently passed by the Legislature.
Senate Bill 278 mandates actual prison time for persons who
use a firearm during the course of certain felonies. It also
mandates prison time for certain ex-felons who are armed with
a firearm during a subsequent felony.

The law enforcement community is united in its belief that
the enactment of Senate Bill 278 will significantly reduce
the criminal use of firearms in California. Under existing
practices (see the attached study) the deterrent effect of our
laws is diminished by the liberal granting of some form of
probation to persons who rob and kill at the point of a gun.
The firm and certain punishment envisioned by Senate Bill 278
will remove dangerous criminals from the streets. It will so
raise the cost to the criminal of using a firearm that some
who might otherwise use firearms will decide not to carry them.

We anticipate that SB 278 will increase the prison population
by approximately 2,000 dangerous criminals per year. Given
current sentencing practices which have reduced the prison
population, and given savings from reductions in probation
subsidy allocations, we do not believe that SB 278 will
impose undue cost on the people of this state. Whatever the
cost, however, we are certain that it will be more than
offset by the lives that will be saved and the pain and
anguish which will be prevented.

Very truly yours,

EVELLE J. YOUNGER

EVELLE J. YOUNGER
Attorney General

Enc.

## Annex H

February 20, 1979

Edward P. O'Brien, Esq. Thomas Nolan, Esq.
Assistant Attorney General 600 University Avenue
State Building Palo Alto, California 94301
San Francisco, California 94102

 Re: Crim. 20075 - People v. Tanner

Gentlemen:

 As you are aware, the above appeal is calendared for oral argument in Sacramento on Wednesday, March 7, 1979, at 2:00 P.M.

 The next-to-last sentence of the amicus curiae brief dated January 26, 1979, submitted by Condit & Hanelt, contains a declaration regarding legislative intent.

 By supplementary brief and/or oral argument, counsel are requested to discuss (1) the relevance to this case of that declaration and related statements in the Condit & Hanelt brief, and (2) the advisability of utilizing post hoc legislative declarations in litigation generally.

 The court is familiar with the recent articles by James Delahanty ("Super Legislators: One Person Amendment of Statutes in California", L.A. Daily J. Rep., No. 78-18, pp. 4-15) and Steven Smith ("Legislative Intent: In Search of the Holy Grail", Ca. S.B.J. Sept.-Oct. 1978, pp. 294-301), and also with footnote 4 on pages 20-21 of the amicus curiae brief of the Los Angeles Public Defender, filed on July 27, 1977.

 Very truly yours,

 G. E. BISHEL
 Clerk of the Supreme Court

GEB:ct

cc: Messrs. Condit & Hanelt Bl cc: Bird, C.J., Tobriner, J.,
 District Attorney, Los Angeles Mosk, J., Clark, J.,
 George C. Martinez, Esq. Richardson, J., Manuel, J.
 Messrs. Monroe & Hansen Newman, J.
 Public Defender, Los Angeles
 State Public Defender
 Rec.
 Reg.
 Cal.

**BIRD, C. J.,** Concurring and Dissenting.—I agree with my colleague, Justice Newman, that this case and its rehearing present a "melancholy tale." As he so succinctly points out, "[t]he politicization of this proceeding after the summer of 1978 became phantasmagoric. A shrill, clamorous campaign—inspired and nurtured by experienced, well-financed, ambitious, and posse-like 'hard on crime' advocates—has had a still incalculable but dismal impact on the judicial process in California." (Conc. opn. of Newman, J., *ante,* at pp. 545-546.)

The original decision in this case was filed on December 22, 1978, and at that time the position advocated by today's majority did not prevail. (See 151 Cal.Rptr. 299.) Nothing new has come before us other than some additional work on legislative history compiled by Justices Newman and Tobriner. Today's majority does not make any attempt to deal with this new material.

Moreover, the *result* reached by this new majority is contrary to the results that three of them so strenuously urged just a few months ago. This is nothing more than an attempt to carve a compromise of expediency. The law has been twisted out of shape to achieve their unique result. To avoid criticism that they have made the defendant a pawn in this process, the majority exempt him from the very standard that will be applied to all other defendants. And what is most discouraging, the majority give short shrift to the difficult issues of legislative intent and constitutional validity in a headlong rush to find a popular solution for an unpopular case.

Have we forgotten that justice is not a matter of expediency? It is not a cloak in which we can wrap ourselves when we find its protection most convenient. It is, rather, a matter of principle, plain and simple. If we hope to maintain a legal system characterized by justice, we cannot defer its application as to even a single case that comes before us.

The challenging points on legislative history and constitutional validity deserve careful consideration. Yet the majority's discussion deals with these issues primarily by silence. It would appear that each justice on this court agrees on certain basic principles relating to the separation of powers clause of our Constitution. (Art. III, § 3.) As Justice Clark has stated in this case, "[t]here has never been any doubt that the courts are *exclusively vested* under the separation of powers doctrine to make *adjudication* of *any issue affecting the penalty* to be imposed in a criminal proceeding." (151 Cal.Rptr. at p. 321, italics added [former dis. opn.].) Yet my colleagues honor this principle only in its breach.

The exercise of this adjudicatory power in no way invades any legislative power to fix the range of possible punishments for a crime. The imposition of a legislatively prescribed sentence on a defendant does not come about until *after* all the issues and factors relative to guilt and to punishment have been finally adjudicated. After the adjudication process is completed, the trial court pronounces judgment* within the limits of the options provided by the Legislature and the other provisions of the Constitution (see, e.g., *In re Lynch* (1972) 8 Cal.3d 410, 414-415 [105 Cal.Rptr. 217, 503 P.2d 921]). Thus, the legal power and duty of the court to impose a sentence or render a judgment within those limits are distinct from its legal power to adjudicate "any issue affecting the penalty to be imposed."

Only the latter "adjudicatory" power of the court is involved in the present case. Before any sentence or judgment could have been imposed on Mr. Tanner by the trial judge, the allegation that Tanner had used a firearm within the meaning of Penal Code section 1203.06 had to be *finally adjudicated.* (*Post,* at pp. 558-559.) The adjudicatory process was not completed at the time the jury rendered its verdict. It was not completed until the trial judge ruled on Tanner's motion to strike the use of a firearm. (See cases collected, *post,* at p. 559, fn. 5, and accompanying text.) Since it is clear that the courts are vested under the separation of powers doctrine with the responsibility for the adjudication of any issue affecting a criminal penalty to be imposed, that constitutional principle was violated when the Legislature attempted to arrogate to itself both the adjudicatory as well as the sentencing function.

Since nothing has changed since this court's initial decision was filed on December 22d, my original concurring and dissenting opinion is set out below.†

This court should not substitute its judgment for that of the Legislature when an issue of statutory interpretation is involved. We "must give full weight" to the intent of the Legislature. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 589 [146 Cal.Rptr. 859, 580 P.2d 274] (conc. opn. of Bird, C. J.).) After consideration of the legislative history of Penal Code section 1203.06, I agree with my colleagues, Justices Manuel, Richardson, and Clark, that the Legislature intended to remove from courts the power to give probation when an individual is convicted of one of the felonies enumerated in that section and a gun is displayed.

---

*"[J]udgment is synonymous with the imposition of sentence [citation] . . . ." (*People* v. *Warner* (1978) 20 Cal.3d 678, 682, fn. 1 [143 Cal.Rptr. 885, 574 P.2d 1237].)

†Some of the citations in my original opinion, as it is set forth in the pages which follow, refer to the previous opinions filed in this case. (151 Cal.Rptr. 299.)

However, this does not end our inquiry, for this case involves more than statutory interpretation. As judges, we have taken an oath of office to uphold the Constitution of this state. Thus, when a legislative enactment contravenes the Constitution, this court cannot defer to the Legislature and remain true to its constitutional mandate. However controversial the question, the court cannot avoid an issue which goes to "the very core of our judicial responsibility." (*People* v. *Anderson* (1972) 6 Cal.3d 628, 640 [100 Cal.Rptr. 152, 493 P.2d 880]; see also, *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 248-249, 256-257 [149 Cal.Rptr. 239, 583 P.2d 1281] (conc. and dis. opn. of Bird, C. J.).) If we were to shrink from the obligations of our oath, the Declaration of Rights would become meaningless. To decide cases based on what is most popular at the moment will ultimately destroy the judiciary as a third branch of government.

This case presents an issue that goes to the heart of our existence as an independent and coequal partner in government. Article III, section 3 of the California Constitution requires that the legislative, executive, and judicial powers be separately exercised by the three branches of government. If we are to remain faithful to that section of the Constitution, we must affirm the judgment of the trial court.

## I

This court must perform the difficult task of removing itself from the politics of the moment without isolating itself from the realities of the day. No one condones the use of a firearm to secure an illegal end. As judges, we share with all citizens the sense of outrage at those who would take the life or property of another at gunpoint. Justice and respect for human life demand nothing less from us. Such actions not only injure individuals, they inevitably tear at the fabric of our society. But just as every human life is irreplaceable, every human being is unique and each situation must be judged individually.

The actual issue before us has been obscured by a number of myths. One such myth is that a defendant who is granted felony probation avoids incarceration. In fact, an individual who is placed on probation for a felony may receive up to one year in the county jail for each offense he has committed. That is exactly what happened in the present case.

That is not the only myth surrounding this case. The slogan "Use a gun, go to prison" has been portrayed as an accurate description of Penal Code section 1203.06. As is often the case with slogans, their simplicity is only exceeded by their inaccuracy. If a person uses a gun in the commission of an offense, he is not necessarily denied probation nor

required to go to state prison. Section 1203.06 does not cover many serious crimes. For example, if an individual commits an assault with a deadly weapon (Pen. Code, § 245, subd. (a)), and he shoots and wounds his victim, he is eligible for probation. Nor does section 1203.06 apply to other dangerous felonies such as assault or battery on a peace officer (Pen. Code, §§ 241, 243), assault with a deadly weapon on a peace officer (Pen. Code, § 245, subd. (b)), battery resulting in a serious bodily injury (Pen. Code, § 243), arson (Pen. Code, § 447a), child molestation (Pen. Code, § 288), lynching (Pen. Code, § 405a), mayhem (Pen. Code, § 203), forcible sodomy (Pen. Code, § 286), and forcible oral copulation (Pen. Code, § 288a). Similarly, felonies such as second degree burglary (Pen. Code, §§ 459, 460) with the use of a firearm are excluded from the scope of section 1203.06.

Further, the prosecutor has complete discretion as to whether to invoke section 1203.06 in those cases where it applies. He may decide not to allege a firearm has been used even when it has. Even after the use of a firearm has been alleged, the prosecutor may move to have the allegation stricken. (See Pen. Code, § 1385.) The prosecutor may agree to dismiss the firearm allegation in exchange for a guilty plea to the underlying offense during plea bargaining. If the prosecutor agrees to a "charge-bargain," he may allow a defendant to plead guilty to an offense which is not covered by section 1203.06.[1]

The point in all these cases is that even though a firearm may have been used, the offender is not automatically stripped of his eligibility for probation and sentenced to state prison. *The so-called mandatory gun law is not mandatory at all.* In section 1203.06, the Legislature has in effect vested in the representative of the executive branch, the prosecutor, all discretion as to a local disposition (probation with a county jail sentence) and withdrawn such discretion totally from the judicial branch.

Historically, sentencing has been considered an inherently *judicial* function since it requires a neutral magistrate who will fairly consider both sides of a question. In enacting Penal Code section 1203.06, the Legislature apparently intended to remove from the court the power to grant probation when an individual is found to have displayed a gun while committing one of the felonies enumerated in that section. After

---

[1]Further, under certain circumstances section 1203.06 may preclude probation, but it does not require a commitment to state *prison.* An offender may be sentenced to the California Youth Authority if under 21 years old; to the California Rehabilitation Center if a narcotics addict or in imminent danger of becoming a narcotics addict; to a state hospital or "an appropriate public or private mental health facility" if the offender is a mentally disordered sex offender who could benefit from such treatment; or to a state hospital if the offender is a mentally retarded person who is a danger to himself or others.

much thought, I am convinced that such a legislative fiat violates the express provisions of article III, section 3 of the California Constitution. By dictating to judges what they can and cannot do in adjudicating with respect to a penalty enhancement factor, the Legislature has violated basic principles of separation of powers and taken away from judges their historic power to match the judgment to the facts of the individual case.

Consider the facts now before us. An experienced trial judge, who handled this matter, found it to be a "very, very rare case." The nature of the offense was described as "bizarre." (151 Cal.Rptr. 299, 301-302 [former maj. opn.].) The investigating detective from the sheriff's office recommended that Mr. Tanner "be placed on probation with a short county jail sentence." The detective did "not feel that the defendant is a candidate for State Prison." He felt that Mr. Tanner's "good record up to the present offense" was an important factor to consider and that "the defendant ha[d] learned a lesson."

The trial judge concluded that Mr. Tanner had a "clean background" and that the firearm was unloaded at all relevant times with "no real intent to use [the] weapon as such" being demonstrated. Mr. Tanner had been honorably discharged from the Army after service in Korea. Formerly he had been the manager of a large department store's branch in the East Bay. Following a divorce, he slipped into a long period of depression. He had no prior criminal record. The trial judge concluded that in this unusual case he would incarcerate Mr. Tanner for one year in the county jail, and require five years of probation with a suspended state prison sentence. The question once again is posited. Does the Legislature have the power to preclude a judge from considering this punishment when a penalty enhancement factor is present? The legal question is ultimately one of the separation of constitutional powers.

## II

It is the constitutional duty of this court to ensure that the essential functions of the judicial branch of government are safeguarded from encroachment by the coequal legislative or executive branches. (Cal. Const., art. III, § 3.) Three times in this decade this court has unanimously held that sentencing courts *alone* have the power to determine whether a penalty should be enhanced. (*People* v. *Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993]; *In re Cortez* (1971) 6 Cal.3d 78 [98 Cal.Rptr. 307, 490 P.2d 819]; *People* v. *Ruiz* (1975) 14 Cal.3d 163 [120 Cal.Rptr. 872, 534 P.2d 712].) The constitutional principles outlined in these decisions clearly control this case.

Article III, section 3 of the California Constitution provides that "[t]he powers of state government are legislative, executive, and judicial." The judicial power of state government is vested by the Constitution in the courts alone. (Cal. Const., art. VI, § 1; cf. Cal. Const., art. IV, § 1 ["The legislative power of this State is vested in the California Legislature . . . ."]; Cal. Const., art. V, § 1 ["The supreme executive power of this State is vested in the Governor."].)

The Constitution further provides that "[p]ersons charged with the exercise of one power [of state government] may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) Thus, because of this requirement of separation of powers, "the exercise of a judicial power may not be conditioned upon the approval of either the executive or legislative branches of government . . . ." (*Esteybar* v. *Municipal Court* (1971) 5 Cal.3d 119, 127 [95 Cal.Rptr. 524, 485 P.2d 1140].) "The judicial power must be independent, and a judge should never be required to pay for its exercise." (*People* v. *Tenorio, supra,* 3 Cal.3d at p. 94.)

This court suggested more than 20 years ago that "in respect to constitutionally vested judicial power" the adjudication and determination of penalty enhancement factors are "inherently and essentially the province of the court." (*People* v. *Burke* (1956) 47 Cal.2d 45, 52 [301 P.2d 241].) The court reasoned that a trial judge has inherent constitutional power under the separation of powers clause to "control the proceedings before it insofar as the essentials of the judicial process are concerned . . ." and that among such "essentials of the judicial process" is the power "to strike or dismiss as to any or all of multiple counts or charges of prior conviction." (*Ibid.*) As Justice Schauer later explained in his noted dissent in *People* v. *Sidener* (1962) 58 Cal.2d 645, 665-666 [25 Cal.Rptr. 697, 375 P.2d 641], "A charge of prior conviction which is found to be true now has serious and far reaching effects on the punishment of the offender . . . ." Thus, he concluded, the power to hear and determine "the important question of dismissing such a charge . . . must . . . be deemed an essential part of the judicial process [and] . . . an implied constitutional power of the courts of this state." (*Id.,* at p. 666, fn. omitted.)

Justice Schauer's dissent in *Sidener* was approved by this court, and the principles of *Burke* were applied, in *People* v. *Tenorio, supra,* 3 Cal.3d 89. In *Tenorio,* the Legislature had promulgated a statute which forbade a sentencing judge from exercising at sentencing the "judicial power to grant a motion to strike priors" without the consent of the prosecutor. (3 Cal.3d at p. 93.) This court held that "the power to strike priors is an essential part of the judicial power" (*ibid.*) vested by the Constitution

exclusively in the courts. Therefore, the exercise of that power could not be overruled or curtailed by a representative of another branch of government. The basic premise of *Tenorio* was clearly consistent with *Burke*: "When the decision to prosecute has been made, the process which leads to acquittal or to sentencing is fundamentally judicial in nature." (*Tenorio, supra,* 3 Cal.3d at p. 94.)

*Tenorio* was followed one year later by *In re Cortez, supra,* 6 Cal.3d 78, which involved a defendant who had been convicted of selling or offering to sell heroin[2] with a prior felony narcotic conviction. At the time the defendant was to be sentenced, former Health and Safety Code section 11715.6 provided that "[i]n no case shall any person convicted of [selling or offering to sell narcotics] be granted probation by the trial court, nor shall the execution of the sentence imposed upon such person be suspended by the court, if such person has been previously convicted of any felony offense described in this division . . . ." (Stats. 1961, ch. 274, § 12, p. 1308.) Although the statute "flatly prohibit[ed] probation" to an individual who had a prior narcotic felony conviction (*In re Cortez, supra,* 6 Cal.3d at p. 85), this court held that article III and article VI, section 1 of the California Constitution permitted the trial court to strike the prior conviction in order to make the defendant eligible for probation.

In *People* v. *Ruiz, supra,* 14 Cal.3d 163, this court reiterated and applied the separation of powers principles in a case legally indistinguishable from the present case. In *Ruiz,* the defendant had been convicted at trial of possession for sale of heroin with a prior felony conviction for possession of narcotics. On appeal, the possession for sale conviction was reduced to simple possession. The case was remanded for resentencing, even though the defendant was still "technically ineligible for probation." (*Id.,* at p. 166.) Health and Safety Code section 11370, subdivision (a)[3] provided that "[a]ny person convicted of [possession of heroin] shall *not,* in any case, be granted probation by the trial court or have the execution of the sentence imposed upon him suspended by the court, if he has been previously convicted of [possession of narcotics]." (Italics added.)

The *Ruiz* court, with my colleague Justice Clark concurring, held that the trial court could strike the prior conviction in order to place the defendant on probation. Despite the language of section 11370, the defendant was held to be "entitled to a new probation hearing wherein

[2]When the defendant in *Cortez* committed his offenses, selling or offering to sell heroin was proscribed by former Health and Safety Code section 11501 (see now, Health & Saf. Code, § 11352).

[3]Health and Safety Code section 11370 was a recodification of former Health and Safety Code section 11715.6, which had been the statute involved in *In re Cortez, supra,* 6 Cal.3d 78. (Stats. 1972, ch. 1407, § 2, p. 2987; Stats. 1972, ch. 1407, § 3, p. 3020.)

the court may make a new judgment relative to his *fitness for probation* in light of the crime of which he now stands convicted." (*People* v. *Ruiz, supra,* 14 Cal.3d at p. 167, italics added.) The constitutional origin of this holding was reemphasized by the court's reference to the "comprehensive range of the [sentencing court's] *constitutional* discretion." (*Ibid.,* italics added.)

The statute involved in the present appeal is in all relevant respects *identical* to the statutes discussed in *Cortez* and *Ruiz.* (See 151 Cal.Rptr. at p. 305, fn. 7 [former maj. opn.].) All three statutes purport to deny probation to defendants when certain penalty-enhancing factors have been found to be true. Since the trial court could strike the enhancing factors in order to find Mr. Cortez and Mr. Ruiz eligible for probation, the lower court in this case had that same power.

The dissent by my colleague, Justice Clark, shows a basic misunderstanding of the constitutional issue presented. That dissent concedes that "the courts are exclusively vested under the separation of powers doctrine to make adjudication of any issue affecting the penalty to be imposed in a criminal proceeding." (151 Cal.Rptr. at p. 321 [former dis. opn.].) However, it is urged that "that is not the issue here. Our concern is with the penalty to be imposed once the adjudication has been made by the court." (*Ibid.*)

With all due respect, the issue the dissent concedes is precisely the issue before this court.[4] A judge's ruling on a motion to strike a penalty

---

[4]This concession contradicts the dissent's contention elsewhere that the judicial power to strike a penalty enhancement factor is not "constitutionally vested" but rather "is dependent upon legislative enactments" authorizing such action. (151 Cal.Rptr. at p. 320 [former dis. opn.].)

In any event, this contention is without merit. "[T]he power to strike priors is an essential part of the judicial power" (*People* v. *Tenorio, supra,* 3 Cal.3d at p. 93) and therefore is vested in the *judiciary alone* by the separation of powers clause of our Constitution. Statutes such as Penal Code section 1385 or former Health and Safety Code section 11718, which refer to the court's power to strike, are merely "evidential of" that power. (*People* v. *Valenti* (1957) 49 Cal.2d 199, 206 [316 P.2d 633].)

"Certain of [the court's] implied powers have received legislative definition; but in each instance the enactment neither created nor circumscribed the powers thus defined. Thus, . . . Penal Code section 1385 . . . is not a *grant* of jurisdiction to dispose in a particular way of the actions pending before it. The court, by virtue of the constitutional provisions above mentioned, already has the complete power to fully adjudicate and, subject only to *judicial* review, finally dispose of, all causes encompassed in the constitutional grant." (*People* v. *Sidener, supra,* 58 Cal.2d at pp. 656-657 (dis. opn. of Schauer, J., fn. omitted, italics in original); see also *People* v. *Valenti, supra,* 49 Cal.2d at p. 206; *People* v. *Burke, supra,* 47 Cal.2d at p. 52; *Bates* v. *Superior Court* (1951) 107 Cal.App.2d 656, 658 [237 P.2d 544].)

The dissent seriously asserts that this court in *Cortez* found that Penal Code section 1203 provided legislative authorization for the trial court's power to strike the prior

enhancement factor for purposes of sentencing is itself part of the adjudication process; the imposition of a sentence required or permitted by statute *follows* this adjudication.

This is apparent from numerous prior decisions of this court, some of which are cited in Justice Clark's dissent. For example, in *People* v. *Burke, supra,* 47 Cal.2d at page 52, this court stated that judicial determination of a motion to strike a penalty enhancement factor at sentencing is "inherently and essentially the province of the court even as the punishment which may or must *follow* the offense adjudicated, either with or without a punishment augmentation factor, is essentially for the Legislature . . . ." (Italics added.) Subsequently, Justice Schauer, in his dissent in *People* v. *Sidener, supra,* 58 Cal.2d at page 653, noted that a motion to strike a prior conviction for sentencing purposes is "a motion made *prior to entry of judgment* in a felony criminal action, the ruling on which will affect the substantial rights of the defendant under *the judgment to follow.*" (Italics added.) As the dissent in the present case recognizes (151 Cal.Rptr. at p. 320, fn. 6 [former dis. opn.]), Justice Schauer's opinion in *Sidener* was subsequently approved by this court. (*People* v. *Tenorio, supra,* 3 Cal.3d at p. 95; see also *People* v. *Navarro* (1972) 7 Cal.3d 248, 259 [102 Cal.Rptr. 137, 497 P.2d 481]; *People* v. *Clay* (1971) 18 Cal.App.3d 964, 968 [96 Cal.Rptr. 213].)[5]

---

conviction in that case. (151 Cal.Rptr. at p. 320 [former dis. opn.].) That assertion is mistaken. At no time has Penal Code section 1203 dealt with—or even mentioned—a court's power to strike a penalty enhancement factor.

The court in *Cortez* did not refer to section 1203 for the reason ascribed to it by the dissent. Rather, it mentioned that section during its examination of "the purposes underlying a motion to strike prior convictions." (*Ibid.*) The court relied on section 1203 solely to show that if the prior conviction were stricken, then the statute which otherwise prohibited probation in *Cortez'* case (i.e., Health & Saf. Code, § 11715.6) no longer would apply to him and he would be eligible for probation within the terms of section 1203. This court did not even remotely suggest that section 1203 itself authorized the striking of the enhancement.

[5]I do not understand the dissent by Justice Clark to contend that the adjudication process as to a penalty enhancement factor is complete simply when a defendant has admitted the enhancement or a judge or a jury has found it to be true. Such a contention would, of course, be meritless. (See generally, *People* v. *Burke, supra,* 47 Cal.2d at pp. 50, 51 [discussing the court's power to strike or dismiss a prior conviction "regardless of whether [the prior conviction] has or has not been admitted or established by evidence"]; *People* v. *Sidener, supra,* 58 Cal.2d at pp. 665-666 [dis. opn. by Schauer, J.) [the power to hear and determine the question of dismissing "a charge of prior conviction which is found to be true" is an implied constitutional power of the courts of this state].)

An unbroken line of decisions by the appellate courts of this state—including an opinion by Justice Clark—authorizes a trial court judge to strike a penalty enhancement factor even after it has been admitted by the defendant (see, e.g., *People* v. *Mesa* (1975) 14 Cal.3d 466, 470-472 [121 Cal.Rptr. 473, 535 P.2d 337] (opn. by Clark, J.); *People* v. *Ruiz, supra,* 14 Cal.3d at pp. 166-168; *People* v. *Navarro, supra,* 7 Cal.3d at p. 257; *People* v. *Tenorio, supra,* 3 Cal.3d 89; *People* v. *Hartsell* (1973) 34 Cal.App.3d 8, 12-15 [109

Since a court's ruling on a motion to strike is part of the adjudication process, *Burke, Cortez,* and *Ruiz* compel the conclusion that the power to strike the penalty enhancement factor in this case is exclusively reserved to the judiciary. Continued adherence to *Burke, Cortez* and *Ruiz* is not a judicial usurpation of the Legislature's prerogative. Rather, it is a constitutional protection of the judicial function from legislative usurpation. These cases simply represent a traditional protection of the judiciary's constitutionally reserved functions as neutral arbiters in the sentencing process.

In the present case the trial court correctly understood that its *responsibility* for determining whether to strike the penalty enhancement was of constitutional dimension. Unless this court overrules *Burke, Cortez,* and *Ruiz,* and rewrites article III, section 3 of the state Constitution, the decision of the trial court must be upheld.

---

Cal.Rptr. 627]) or has been found true by a judge or jury (see, e.g., *People* v. *Prater* (1977) 71 Cal.App.3d 695, 700-703 [139 Cal.Rptr. 566]; *People* v. *Dorsey* (1972) 28 Cal.App.3d 15 [104 Cal.Rptr. 326]).